[No. S058092. Aug. 29, 2005.]

THE PEOPLE, Plaintiff and Respondent, v.
MAURICE LYDELL HARRIS, Defendant and Appellant.

COUNSEL

Glen Niemy, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, John R. Gorey and Rama R. Maline, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

CHIN, J.—A jury found defendant Maurice Lydell Harris guilty of the attempted murder of Bernard Canto (Pen. Code, §§ 187, 664)[1] and the murders of Alicia Allen and her fetus (§ 187), finding that he committed the murders under the special circumstances of felony-murder robbery, felony-murder burglary (§ 190.2, subd. (a)(17)(A), (G)), and multiple murder (§ 190.2, subd. (a)(2)). The jury also found defendant guilty of robbery and burglary (§§ 211, 459), and found that he personally used a firearm in the commission of the attempted murder (§ 12022.5), that he was personally armed during the commission of the murders, the robbery, and the burglary (§ 12022, subd. (a)(1)), and that he inflicted great bodily injury in the commission of the attempted murder (§ 12022.7, subd. (a)). After a penalty trial, the jury returned a verdict of death for the murder of Allen, and life without the possibility of parole for the murder of Allen's fetus. The court denied the automatic motion to modify the verdict of death (§ 190.4) and imposed that sentence. This appeal is automatic. (§ 1239, subd. (b).)

We affirm the judgment.

## I. FACTS

A. *Guilt Phase*

1. *Prosecution Evidence*

At 10:25 p.m. on August 9, 1994, a Gardena police officer on patrol saw Bernard Canto stumble and fall to the pavement in front of his police car on South Vermont Boulevard. Canto stated he had been shot near where his van was parked. The police found Canto's van parked nearby in front of the gated apartment complex where defendant lived. On the passenger side of the van

---

[1] Unless otherwise indicated, all section references are to the Penal Code.

they found blood and nine-millimeter shell casings. Across the street they found a bloody shirt and a pair of bloody shorts containing a wallet, papers, and phone cards bearing Canto's name, $150 in cash, and a beeper.

The security officer on duty at defendant's apartment complex told police that, earlier that night, two men talked to him for a short time in the security office, and approximately a half-hour later he heard gunshots outside the security gates. He saw a white car and a blue car that had been in the middle of the street back up and drive off in the wrong direction down South Vermont Boulevard.

At 11:11 p.m., within an hour of Canto's shooting, the Gardena police responded to a call regarding a shooting at Canto's house on West Marine Avenue, approximately 1.6 miles from the site of the South Vermont Boulevard shooting. Loud music could be heard coming from inside the house. A chain-link fence surrounded the house, and a security gate on the front door was shut and locked. The police went to the back of the house through an open gate and found a bloodstain and a jammed nine-millimeter Beretta handgun on the driveway. Inside the house they found Canto's fiancée, Alicia Allen, who was 17 weeks pregnant, lying facedown on the bed with her hands tied behind her back with a sock and twine. She had been shot twice in the head. Allen and her fetus were dead.

In the dining room police found an open key box on the wall and keys scattered on the floor. The living room couch was in disarray, and amidst the upended cushions police found a gold chain and a broken fingernail with nail polish matching that worn by Allen. The bedroom had been ransacked. A nine-millimeter handgun and bullets were in a dresser drawer that had been pulled out of the dresser and placed on the bed, and expended bullets and shell casings were found on the floor.

The gun found in the driveway, which bore no discernable fingerprints, had fired all of the bullets used to shoot Allen and Canto, as well as the bullets from the bedroom. The bloodstain in the driveway possessed genetic characteristics consistent with defendant's blood. From the area where the bloodstain was found, police found trace amounts of human genetic material that did not match either Allen or defendant and that could have come from any bodily fluid. The police could not determine how long that material had been on the driveway.

Several of Canto's neighbors on West Marine Avenue testified that on the night of August 9, 1994, they saw two Black men dressed in dark clothing approach Canto's house. One of the men stayed on the sidewalk in front of the security gate, and the other went to the front door where he met and

talked to Allen, and then went inside with her. Within 10 or 15 minutes the neighbors heard three or four gunshots in quick succession, and shortly thereafter saw two Black men fleeing on foot eastward on West Marine Avenue, at least one of whom was limping. One of the men was husky and six feet tall and may have worn his hair in dreadlocks or a ponytail. The other man was thin and may have worn a hat. The neighbors did not see anyone else come out of Canto's house, or see anyone get into a car and drive away. (The record gives no indication of the identity of the other person.)

Although Canto survived the shooting of August 9, 1994, he was murdered in Chicago in November 1995, and therefore was unavailable to testify at trial in 1996. The prosecution read into the record the transcript of his preliminary hearing testimony.

Canto testified that in August 1994, he earned a living by restoring and selling cars bought at auction. He paid cash for the cars, and often kept large sums of money in the house he shared with Allen on West Marine Avenue. On August 9, 1994, at 8:30 p.m., Canto received a call from defendant, whom he considered to be his friend and with whom he had engaged in several business dealings. Defendant told Canto to pick him up at the corner of Normandie and Rosecrans Avenues and defendant would repay a debt of $1,500 he owed Canto. Canto left his house at 9:30 or 10:00 p.m., picked up defendant, and drove back to defendant's apartment complex on South Vermont Boulevard. He and defendant went upstairs to defendant's apartment, but because defendant had forgotten his keys they could not get in. On their way back to Canto's van they stopped and talked to the security guard of the apartment complex and asked him if he had an extra key to the apartment. Canto and defendant then got back into Canto's van and returned to an address at Normandie and Rosecrans Avenues, where defendant retrieved his apartment keys from his girlfriend. Canto and defendant then returned to defendant's apartment complex.

Canto testified that he parked his van in front of defendant's apartment, got out, locked the door, walked around the van, and heard repeated gunshots. He turned around and saw defendant shooting at him from seven feet away, with his arm outstretched holding a black nine-millimeter gun. Canto asked defendant, "Maurice, why?" Defendant laughed. Canto testified bullets hit him in the back, side, and hip. He fell, then got up and walked to the side of the street where he encountered the police car.

Canto told police that when he left his house that evening everything was in order. Allen was alive, wearing a pair of diamond earrings, a gold chain, an engagement ring, a gold wedding band, a class ring, and another gold ring. Three of these rings she wore all the time and never took off. He kept $500 in

cash in the bedroom drawer. When Canto returned to the house after a month in the hospital, he did not specifically check for missing items, but he did note that the $500 in cash and a car phone were missing.

Canto did not at first identify defendant as the man who shot him. At the scene of the shooting, when paramedics were attending to his wounds, he told police his shooter was a Black male, 29 to 30 years old. A detective of the Gardena Police Department testified that when he interviewed Canto in the intensive care unit of the hospital in the early morning of the second day following the shooting, Canto first told him a Black male had come up and shot him for no apparent reason. The detective testified that it was clear Canto did not know at the time of that interview that Allen was dead, and when the detective told Canto that Allen had been murdered less than an hour after he had been shot, Canto became very upset, started to cry, and had to be sedated. The detective returned to the hospital the next day and interviewed Canto again. Canto then identified defendant by name as his shooter, described in detail the events of the night of the shooting, and picked defendant's photograph from a photo lineup.

Canto admitted that he lied the first two times the police interviewed him when he denied knowing the identity of his shooter, and explained that he did so because he was not thinking straight, was in pain, and intended to "take care of the matter" himself by killing defendant.

Regina Mills testified that for three or four weeks before September 16, 1994, the date of his arrest, defendant stayed with her at her Los Angeles apartment. Defendant had short hair, but Mills saw him wear a long, curly-haired wig the entire time he was staying with her. She testified defendant limped and used a cane, and she saw a long, deep, burn-like injury starting near the knee and a hole that looked like a gunshot wound on defendant's right leg. She saw an injury on a toe on his right foot.

Mills testified that while staying at her apartment, defendant met with other men and women, often left the apartment for an hour or two, and made and received numerous phone calls. Mills overheard defendant on the phone say, in a stressed and worried tone, that he should have gone to Allen's funeral, and that someone who "lived" was in the hospital. Two days before defendant's arrest, Mills heard him talk about leaving town. Defendant told Mills the police were looking for him and that he had injured his leg in a shootout during a robbery during which "another guy" had also been shot. He said he thought he shot a pregnant woman. In exchange for her testimony, Mills received immunity from prosecution for charges of harboring a fugitive and receiving stolen property, and was placed in a witness relocation program.

When the police arrested defendant at Mills's apartment, defendant was carrying a map of Atlanta, telephone numbers for Amtrak railway and Greyhound Bus, marijuana, and a tube of mascara. He was wearing eyeliner, and he was limping. He initially identified himself to the police as Kenny Jordan. Defendant's duffel bag contained men's clothing, medicine, six Greyhound Bus tickets to Atlanta, cash, and a large amount of cocaine. After his arrest, defendant called Mills and threatened to kill her because he thought she had informed the police of his whereabouts.

### 2. *Defense Evidence*

Defendant testified about the night of the shootings. He admitted that he had told no one the version of events he gave at trial. He denied killing Allen and her fetus, and explained that the shooting resulted from a drug deal gone bad. He explained he went to Canto's house to deliver cocaine and encountered two men who shot and tried to kill him before he made his escape.

Defendant informed the jury that he had been convicted of federal drug possession charges in 1988 and was incarcerated in a federal prison until August 1993. He was on a Christmas furlough in 1992 when he met Canto. When he was released from federal prison he worked at World Class Coach, an auto body shop in Los Angeles where Canto often brought cars for repair.

Defendant and Canto went into business together dealing drugs. Defendant described himself as "kind of a popular guy," who had a lot of drug world connections because of his recent federal incarceration and explained that he and Canto had engaged in seven large-scale cocaine deals and numerous marijuana deals between March and August of 1994. He said his role in these deals was "the middle man" who put together buyers with sellers, and explained how he was able to get cheaper prices from certain "contacts" and thereby increase his profits. He had expertise in the "cutting and cooking" of cocaine; he explained how he would use a microwave oven to turn powdered cocaine into rock cocaine, and how he would use specially fashioned metal boxes to compress what he called "procaine" into a "dummy kilo" of fake cocaine to be used to swindle people in drug deals. Defendant told the jury he was motivated by the "greed and easy money and ego and thrill" associated with drug sales.

On the morning of August 9, 1994, Canto contacted defendant at his apartment and told him he had a deal set with buyers from Chicago who wanted to purchase a kilogram of cocaine for $16,000. Defendant went to Canto's house on West Marine Boulevard to discuss the details of the transaction; defendant would get the cocaine and Canto would page defendant when he was ready to receive the drugs on behalf of the buyers. That

afternoon, defendant went to his supplier, "Greg," who did not have the exact amount of cocaine defendant wanted but who did have a dummy kilo of fake cocaine defendant had made for him earlier in the week. Greg and defendant decided to use the fake cocaine in the deal with Canto, and Greg agreed to give defendant an additional nine ounces of real cocaine, worth about $4,500, as his payment for conducting the sale of the fake cocaine. Defendant explained that although there was a lot of trust between drug dealers, he decided not to tell Canto the cocaine he would deliver to the buyers was fake.

Defendant testified Canto paged him around 10:00 p.m.[2] Twenty minutes later, defendant drove up to his apartment complex on South Vermont Boulevard and saw Canto standing on the street leaning into a midsize car. Defendant and Canto went upstairs to defendant's apartment. Defendant testified he began to have second thoughts about going through with the deal with the fake cocaine because the buyers now knew where he lived; he also stated, however, that he was not concerned that at the time of the exchange the buyers would test the kilo and discover the fraud because Canto told him the buyers were in a hurry and would take the cocaine and go directly to the airport and leave for Chicago. He explained, "most of the time, believe it or not, that is how it goes." He thought that a possible way to get out of making the deal would be to make a complaint at the security office of the apartment complex that one of his cars was missing and have the security officer contact the police. Defendant acknowledged that his "greed outweighed his [concerns about] safety," and it never occurred to him to merely tell Canto that he had not been able to get the amount of cocaine he wanted.

On their way back to the buyer's car to get the money, defendant and Canto did stop to talk to the security guard at the apartment complex. The conversation lasted about 10 minutes. Canto then got the money from the buyers. Defendant and Canto returned to defendant's apartment where defendant gave Canto the kilo of fake cocaine. Canto then told defendant he wanted four more ounces of cocaine right away. Defendant agreed to get it from Greg and bring it to Canto's house as soon as possible. Canto left, and two minutes later defendant took the $16,000 back to Greg's apartment, stayed there for 20 minutes, picked up the extra four ounces of cocaine for Canto and $200 in cash, and left for Canto's house on West Marine Avenue.

Defendant testified that when he got to Canto's house, he parked the car behind Canto's red van in the driveway. When he got inside the house, a man

---

[2] Defendant testified on direct examination that Canto initially paged him "around 10:00 p.m." On cross-examination, he said that the shootings inside the house on West Marine Boulevard, which occurred substantially later than the paging, happened just after 10:00 p.m. (Canto encountered the police on South Vermont Boulevard just after he was shot at 10:25 p.m.; Canto's neighbors reported the shootings at West Marine Boulevard at 11:11 p.m.)

put a gun to his side and said, "Come on in, boy." Another man pushed him to the ground, kicked him, and tied his hands behind his back with an extension cord. Someone asked him where their money was, and said, "Go do something." He could not see the faces of these people, but he could hear their footsteps in the house and he heard someone go out the back door.

Defendant decided his only chance to survive was for him also to go out the back door, so he loosened his hands from the extension cord behind his back and started to run. He heard gunshots, and thought the people inside the house were shooting at him. As he was going down the back steps a man who was taller than he and who had long hair grabbed him from the front, "like a bear hug." A second man grabbed him from behind, then reached in and put a gun between defendant and the first man, who was still holding him in the bear hug. The second man then shot defendant in the right leg and defendant fell to the ground. The first man also cried out that he had been shot. Defendant assumed that he and the first man had been hit by the same bullet.

The second man then pointed the gun at defendant and tried to shoot him in the face but the gun jammed and the man threw the gun to the ground. Both the first and second man then ran around one side of the house. Defendant ran in the opposite direction around the other side of the house and through the front gate to his car. He drove to his girlfriend's house in Inglewood and stayed there for two or three days. From there he went to Greg's house in Pasadena and stayed there until he was healed, about three weeks.

Defendant testified he spent time at Mills's apartment before his arrest on September 16, 1994. He feared returning to his own apartment; he continued to conduct his drug business from Mills's apartment. Defendant stated that Mills sold marijuana for him and that he used her apartment to store cocaine. He denied wearing makeup or a wig. He explained that the mascara in his pocket at his arrest must have gotten there when Mills gave him some marijuana and he put it in his pocket. He denied telling Mills about the events at Canto's house.

Defendant acknowledged that he did have earlier plans to go to Atlanta to visit a girlfriend but changed his plans before August 9, 1994, and at the time of trial he did not know how to contact his Atlanta girlfriend. He testified that he had also lost contact with the girlfriend in Inglewood, and that Greg died in 1994 or 1995 while defendant was awaiting trial. He further acknowledged that he gave false identities to police both when he was arrested for drugs in 1988 and when he was arrested for Allen's murder on September 16, 1994, and that he gave false information on an employment application, on his California driver's license application, and on his rental application.

## B. *Penalty Phase*

### 1. *Prosecution Evidence*

At the penalty phase, Alicia Allen's mother, Pamela Gunn, testified to the close relationship she had with Allen, her only child, whom she raised alone. She related how Allen was artistic, and had done well in high school where she was on the debate team. She was a cheerleader and a dancer. Allen had attended some college, but subsequently left school and left home. Gunn testified that on Mother's Day 1994, just months before the murders, Allen had showed off a diamond engagement ring and spoken of plans to marry Canto and return to college in the fall. Gunn described how she learned of the murder, and of the emotional and financial costs involved in planning and attending the funeral. She presented a photograph of Allen's gravesite and testified about the emotional toll she and her family experienced at the mortuary in viewing Allen's naked body and seeing two gaping bullet wounds to the head, broken fingernails, and an "ugly" autopsy incision. She testified about the impact Allen's death had had on her. Allen's grandmother also testified about the impact of Allen's death and her viewing of the body.

On cross-examination, the defense established that Gunn had not had direct contact with Allen for over a year, that she had not known where Allen lived, and that Allen was working at minimum-wage jobs.

### 2. *Defense Evidence*

Defendant's community college track coach testified that he was a hard worker and a quiet, respectful student who had the potential to be a world-class athlete. An employee at Edwards Air Force Base testified that while defendant was an inmate at the Boron Federal Prison for his 1988 drug possession conviction, she supervised his work on projects at the airbase. He and other inmates were bused to the airbase from the prison grounds. She supervised his work for eight or nine months, during which time she found him to be quiet when spoken to, and an average and obedient worker. He treated her with respect. A deputy attorney general who knew defendant through a church-sponsored prison ministry fellowship testified defendant stayed in his home for two weeks during his federal prison furlough. He found defendant to be respectful and interested in sports. Finally, Canto's ex-wife testified she had seen Canto with $6,000 in cash in a brown paper bag and she could not account for the source of the money. She had never seen Canto with illegal drugs.

## II. DISCUSSION

### A. *Jury Selection Issues*

Defendant claims the trial court erred in granting four of the prosecution's challenges for cause. He also claims the court excused a qualified juror and, in conducting assertedly inadequate voir dire, restricted his ability to determine the qualification of three other jurors.

█ "The trial court may excuse for cause a prospective juror whose views on the death penalty would prevent or substantially impair the performance of that juror's duties." (*People v. Smith* (2003) 30 Cal.4th 581, 601 [134 Cal.Rptr.2d 1, 68 P.3d 302]; see also *Wainwright v. Witt* (1985) 469 U.S. 412 [83 L.Ed.2d 841, 105 S.Ct. 844].) On appeal, we will uphold the trial court's ruling if it is fairly supported by the record, and we accept as binding the trial court's determination as to a prospective juror's true state of mind when that juror has made conflicting or ambiguous statements. (*Smith*, at p. 602.)

Because the record supports the trial court's findings that Prospective Juror L.S.'s personal feelings would prevent her from being able to impose the death penalty, and because the voir dire of Prospective Jurors J.R., D.B., and J.P. was not inadequate, defendant's claims of error have no merit.

In the 17-page written questionnaire, Prospective Juror L.S. indicated she would "probably get cold feet" and would not want the personal responsibility of deciding to actually impose the death penalty. During voir dire, she stated that she would have to be convinced "that there was [*sic*] no kind of mitigating circumstances at all before I could see being responsible for putting somebody to death." The court explained, "The law does not say in order to come back with death there be no mitigating circumstances," and "[when] the aggravating factors so substantially outweigh the mitigating then the juror should vote for death and not otherwise." When asked, "Could you follow that instruction or are you going to want something else to use, some different standard of your own," L.S. replied, "It is like I said. It would have to be overwhelmingly is how I feel about it. Overwhelmingly aggravating circumstances."

Defendant argues the trial court should have ceased voir dire when L.S. said she did not like the death penalty but could impose it under "overwhelmingly aggravating circumstances." He argues the following colloquy should not have occurred:

"Court: I want to know within your heart of hearts in your case, not some other case, this case, if you could actually give both sides a fair call on

penalty if we have a penalty phase or are you going to set an unrealistic standard for yourself that could never be met?

"L.S.: I don't think I can put somebody to death, no.

"Court: Both sides are entitled to have 12 jurors that, if necessary, can make that choice and make the choice based on the law that I outlined and make it fair for the defendant, fair for the prosecution, the sides they represent here. Do you believe you are a juror who can do that or do you think that your abilities are substantially impaired by your feelings about the death penalty?

"L.S.: Really I don't think that I could vote for the death penalty, no . . . . Not knowing any circumstances about the case or like you say mitigating and aggravating, I am 80 or 90 percent sure I couldn't do it."

Defendant did not object to this voir dire and therefore has forfeited the claim for appeal. (*People v. Benavides* (2005) 35 Cal.4th 69, 88 [24 Cal.Rptr.3d 507, 105 P.3d 1099].) In any event, the claim has no merit. Contrary to defendant's assertions, the additional questioning was not misleading or confusing. These questions aided in determining whether L.S. harbored any bias that would prevent her from following the instructions to consider aggravating and mitigating evidence (*People v. Cash* (2002) 28 Cal.4th 703, 721–722 [122 Cal.Rptr.2d 545, 50 P.3d 332]), and allowed the court to identify a juror whose death penalty views would prevent or substantially impair the performance of her duties as a juror (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 47 [17 Cal.Rptr.3d 710, 96 P.3d 30]). L.S.'s answers also demonstrated her inability and unwillingness to engage in the weighing process necessary to determine whether death was the appropriate penalty, and the trial court reasonably could find substantial impairment in L.S.'s abilities to perform duties as a juror. (See *People v. Stewart* (2004) 33 Cal.4th 425, 447 [15 Cal.Rptr.3d 656, 93 P.3d 271]; *People v. Griffin* (2004) 33 Cal.4th 536, 558–562 [15 Cal.Rptr.3d 743, 93 P.3d 344].) We reject defendant's assertion that Prospective Juror L.S. was improperly excused.

Defendant's challenge to the adequacy of the voir dire of Prospective Jurors J.R., D.B., and J.P. also lacks merit. J.R. indicated in the questionnaire that he was not comfortable with the death penalty and that he would "always vote for life imprisonment without possibility of parole and reject the death penalty, regardless of the evidence presented at trial." During voir dire by the court he said that he had held these beliefs about the death penalty for a long time. D.B. stated in the questionnaire that he believed the death penalty was appropriate in some circumstances and should be used as a last resort, but

also stated he would always vote for life imprisonment, and that the responsibility of making such a decision was more than he could handle. Brief voir dire by the court revealed that D.B. would always vote for life without possibility of parole. J.P. gave conflicting and confusing answers to questions posed in both the questionnaire and voir dire, and the court determined she was not capable of understanding the basic concepts involved in a death penalty case.

Defendant claims the court did not ask enough questions to resolve the apparent ambiguities shown in these jurors' answers. We disagree. " '[W]e pay due deference to the trial court, which was in a position to actually observe and listen to the prospective jurors. Voir dire sometimes fails to elicit an unmistakably clear answer from the juror, and there will be times when "the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law. . . . [T]his is why deference must be paid to the trial judge who sees and hears the juror." ' " (*People v. Griffin, supra,* 33 Cal.4th at p. 559.) Such findings by the trial court are generally binding if the prospective juror's responses are equivocal or conflicting. (*Id.* at p. 558; *People v. Ashmus* (1991) 54 Cal.3d 932, 962 [2 Cal.Rptr.2d 112, 820 P.2d 214].) The record supports the court's findings that each of these prospective jurors lacked either the ability or the willingness to engage in the performance of duties as jurors in a death penalty case, and we defer to its decision that no further questions were necessary.

B. *Guilt Phase Issues*

1. *Evidentiary Rulings*

a. *Admission of Evidence*

i. *Videotape of victim*

Defendant claims the court committed error in admitting a videotape of Alicia Allen taken two weeks before her murder. He renews the objection made at trial pursuant to Evidence Code section 352 that the tape was more prejudicial than probative.

Courts should be cautious in the guilt phase about admitting photographs of murder victims while alive, given the risk that the photograph will merely generate sympathy for the victims. (*People v. Osband* (1996) 13 Cal.4th 622, 677 [55 Cal.Rptr.2d 26, 919 P.2d 640].) But the possibility that a photograph will generate sympathy does not compel its exclusion if it is otherwise relevant. (*People v. DeSantis* (1992) 2 Cal.4th 1198, 1230 [9 Cal.Rptr.2d 628, 831 P.2d 1210].) The decision to admit victim photographs

falls within the trial court's discretion, and an appellate court will not disturb its ruling unless the prejudicial effect of the photographs clearly outweighs their probative value. (*People v. Navarette* (2003) 30 Cal.4th 458, 495 [133 Cal.Rptr.2d 89, 66 P.3d 1182].)

Allen's mother testified that Allen regularly wore numerous pieces of jewelry that she never took off, including a diamond engagement ring and a high school class ring. The prosecution played a silent, 40-second-long portion of a videotape taken of Allen at a child's birthday party two weeks before her death. Her mother identified the engagement ring and several necklaces shown on the videotape, and testified that with the exception of a small "pinky" ring, none of the jewelry shown in the videotape or any other pieces of Allen's jewelry were ever recovered.

Defendant claims the videotape was more prejudicial than probative, and the videotape showing a children's birthday party was emotionally charged and served to highlight Allen's "innocent nature." We disagree. The videotape was relevant to proving Allen owned and wore jewelry that allegedly was stolen during the course of the murders, and was not made inadmissible, as defendant argues, because the prosecution could have established the same relevant fact by other means. (*People v. Navarette, supra,* 30 Cal.4th at pp. 495–496.) We have reviewed the videotape and agree with the trial court that although it was taken during the course of a child's birthday party, it does not engender an emotional reaction but is neutral and unremarkable. The court acted within its discretion in admitting the evidence.

### ii. *Canto's preliminary hearing testimony*

Defendant next claims the court erred in admitting Canto's preliminary hearing testimony. Because defendant objected only to the deletion of certain portions of Canto's testimony and not to its admission per se, he failed to preserve this claim for appeal. (Evid. Code, § 353.)

In addition, the claim lacks merit. "The confrontation clauses of both the federal and state Constitutions guarantee a criminal defendant the right to confront the prosecution's witnesses. (U.S. Const., 6th Amend.; Cal. Const.[,] art. I, § 15.) That right is not absolute, however. An exception exists when a witness is unavailable and, at a previous court proceeding against the same defendant, has given testimony that was subject to cross-examination." (*People v. Cromer* (2001) 24 Cal.4th 889, 892 [103 Cal.Rptr.2d 23, 15 P.3d 243].) Such statements are not made inadmissible by the hearsay rule if the cross-examination was made "with an interest and motive similar" to that at the prior proceeding. (Evid. Code, § 1291, subd. (a)(2).) In this case, Canto's death rendered him unavailable to testify at trial. (Evid. Code, § 240,

subd. (a)(3).) Accordingly, the prosecution introduced an edited version of Canto's preliminary hearing testimony. (*Id.,* § 1291, subd. (b).)[3]

Defendant argues that at the time of the preliminary hearing, counsel did not know of Canto's illegal drug activities, and consequently he did not have an opportunity to cross-examine with the same interest and motive as he would have, had Canto been available at trial. He asserts that the testimony gave the jury a false and misleading impression of Canto's credibility and thereby undermined defendant's right to a fair determination of guilt and penalty. Defendant cannot now be heard to complain that the defense did not know of Canto's drug dealing prior to the preliminary hearing; by his own admission at trial, he and Canto had been engaged in drug dealing for some time before August 9, 1994.

■ Moreover, a defendant's interest and motive at a second proceeding is not dissimilar to his interest at a first proceeding within the meaning of Evidence Code section 1291, subdivision (a)(2), simply because events occurring after the first proceeding might have led counsel to alter the nature and scope of cross-examination of the witness in certain particulars. (*People v. Alcala* (1992) 4 Cal.4th 742, 784 [15 Cal.Rptr.2d 432, 842 P.2d 1192].) The " 'motives need not be identical, only "similar." ' " (*People v. Samayoa* (1997) 15 Cal.4th 795, 850 [64 Cal.Rptr.2d 400, 938 P.2d 2].) "Both the United States Supreme Court and this court have concluded that 'when a defendant has had an opportunity to cross-examine a witness at the time of his or her prior testimony, that testimony is deemed sufficiently reliable to satisfy the confrontation requirement [citation], regardless whether subsequent circumstances bring into question the accuracy or the completeness of the earlier testimony.' " (*People v. Wilson* (2005) 36 Cal.4th 309, 343 [30 Cal.Rptr.3d 513, 114 P.3d 758]; see *California v. Green* (1970) 399 U.S. 149 [26 L.Ed.2d 489, 90 S.Ct. 1930].) Defendant's interest and motive in cross-examining Canto at the preliminary hearing were similar to those at trial: to challenge Canto's credibility and discredit his account of the shooting. Defense counsel conducted an in-depth cross-examination twice as long as the direct examination, which succeeded in eliciting evidence that challenged Canto's credibility.[4] Accordingly, defendant's opportunity to cross-examine Canto at the preliminary hearing satisfied the confrontation clause, and any objection to the preliminary hearing testimony would have lacked merit.

---

[3] Evidence Code section 1291, subdivision (b), provides: "The admissibility of former testimony under this section is subject to the same limitations and objections as though the declarant were testifying at the hearing, except that former testimony offered under this section is not subject to: [¶] (1) Objections to the form of the question which were not made at the time the former testimony was given, [¶] (2) Objections based on competency or privilege which did not exist at the time the former testimony was given."

[4] Canto admitted he twice lied to police when asked if he knew the identity of his shooter.

### iii. *Testimony regarding Canto's statements*

Two witnesses testified about statements Canto made after the shootings. Defendant claims the court erred in admitting the evidence.

At the preliminary hearing Canto denied being a "loan shark" and described himself as a businessman who fixed and resold cars bought for cash at auction. Detective Davila of the Gardena Police Department impeached Canto when Davila testified for defendant on direct examination regarding a small portion of a telephonic interview he conducted while Canto was still in the hospital. He testified Canto admitted that the reason he had large quantities of cash at his house was because he was in the illegal "loan shark" business.

On cross-examination of Davila, the prosecution established that Canto initiated the telephonic interview in the hospital by asking a nurse to call the police so he could "set the record straight" and tell the police information regarding his shooting and the murder of Allen, and so he could explain that at all prior police contacts, he had lied when he denied knowing the identity of his shooter. Over objection that it was beyond the scope of direct examination, Davila then testified about what Canto told him were the events of the evening of August 9, 1994, wherein Canto said that he had lent money to defendant, that defendant had contacted him that afternoon in order to repay the loan, that while driving defendant to and from his apartment in an effort to get the money owed, defendant shot him, that he lied to the police initially when he told them he did not know the identity of the shooter, that he explained "if it took him the rest of his life, he was going to get even and take care of the defendant himself," but after learning while in the hospital that Allen had been murdered, Canto decided it "was no longer personal" and wanted the police to get involved. With the exception of his admission that he was a "loan shark," this was essentially the same evidence Canto testified to at the preliminary hearing.

Defendant claims the court erred in admitting the portion of Canto's hospital interview elicited during cross-examination because that testimony was beyond the scope of direct examination.

█ A witness may be cross-examined on any matter within the scope of direct examination. (Evid. Code, § 773.) "Where part of an act, declaration, conversation, or writing is given in evidence by one party, the whole on the same subject may be inquired into by an adverse party . . . ." (*Id.*, § 356.) " 'In applying Evidence Code section 356 the courts do not draw narrow lines around the exact subject of inquiry. "In the event a statement admitted in evidence constitutes part of a conversation or correspondence, the opponent is

entitled to have placed in evidence all that was said or written by or to the declarant in the course of such conversation or correspondence, provided the other statements have *some bearing upon, or connection with,* the admission or declaration in evidence. . . ." [Citation.]' " (*People v. Zapien* (1993) 4 Cal.4th 929, 959 [17 Cal.Rptr.2d 122, 846 P.2d 704].) Further, the jury is entitled to know the context in which the statements on direct examination were made. (*People v. Sanders* (1995) 11 Cal.4th 475, 520 [46 Cal.Rptr.2d 751, 905 P.2d 420] [where defense counsel elicited portions of investigative interview with witness, prosecution not foreclosed from inquiring into context of statements on redirect examination of witness and cross-examination of investigator].)

Canto's admission to Davila that he participated in illegal loan shark activity contradicted his preliminary hearing testimony and was placed into evidence by defendant. The prosecution was entitled to present the entire context in which Canto made the admission, including his explanation of the events of the August 9 shooting, which he asserted arose out of his loan shark activity. The court did not err in allowing Davila to testify to the remainder of Canto's hospital admission.

Defendant further claims these statements elicited on cross-examination of Davila were inadmissible hearsay. By not objecting to admission of the statements as hearsay, defendant failed to preserve the issue for appeal. (*People v. Williams* (1997) 16 Cal.4th 635, 681 [66 Cal.Rptr.2d 573, 941 P.2d 752].) Were we to consider the claim on the merits, it would fail. The statements were admissible for the nonhearsay purpose of placing Canto's statements into context. (*People v. Turner* (1994) 8 Cal.4th 137, 190 [32 Cal.Rptr.2d 762, 878 P.2d 521].)

Over objection, the prosecution called in rebuttal Lyndon Bull, the owner and manager of the World Class Coach Works auto body shop where both defendant and Canto worked. He testified he had known defendant since high school; that in late 1993 or early 1994, he had given defendant a full-time job for $150 a week "pick[ing] up parts"; that he was training Canto to do repair estimates; and that when defendant eventually failed to show up for work following the shootings his friends and family and coworkers looked for him for nearly a month but did not find him and defendant never called or showed up at work again.

█ Defendant argues, as he did at trial, that this was improper rebuttal evidence. The decision to admit rebuttal evidence rests largely within the discretion of the trial court and will not be disturbed on appeal in the absence of demonstrated abuse of that discretion. (§ 1093, subd. (d); *People v. DeSantis, supra,* 2 Cal.4th at p. 1232.) " '[P]roper rebuttal evidence does not

include a material part of the case in the prosecution's possession that tends to establish the defendant's commission of the crime. It is restricted to evidence made necessary by the defendant's case in the sense that he has introduced new evidence or made assertions that were not implicit in his denial of guilt.'" (*People v. Young* (2005) 34 Cal.4th 1149, 1199 [24 Cal.Rptr.3d 112, 105 P.3d 487], quoting *People v. Carter* (1957) 48 Cal.2d 737, 753–754 [312 P.2d 665].)

The rebuttal testimony of Lyndon Bull as to the limited scope of defendant's job at the auto body shop properly challenged defendant's testimony that he was "basically [the] assistant manager" of the shop, that he "helped run the place, do estimates, make sure that everybody gets paid, write the checks and pay invoices," and that he was gone from work starting August 1, 1994, because he was on vacation. We find no abuse of discretion in permitting this testimony.

■ In addition, over a hearsay objection, Bull testified that three or four weeks after the shooting, Canto came into the auto body shop and said defendant had "shot him up." Defendant argues this was inadmissible hearsay testimony. We agree. Hearsay evidence is "evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." (Evid. Code, § 1200, subd. (a).) Unless an exception applies, hearsay evidence is inadmissible. (*Id.*, subd. (b).) Canto's statement to Bull was an out-of-court statement, and respondent does not suggest that it comes within any exception or that it was offered for any purpose other than to prove defendant shot Canto. The admission, therefore, was error. The error, however, was harmless. ■ We have held the application of ordinary rules of evidence does not implicate the federal Constitution, and thus we review allegations of error under the "reasonable probability" standard of *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]. (*People v. Marks* (2003) 31 Cal.4th 197, 226–227 [2 Cal.Rptr.3d 252, 72 P.3d 1222].) Because Bull merely repeated statements similar to Canto's preliminary hearing testimony, it is not reasonably probable that the error affected the outcome of the trial. Indeed, assuming defendant has preserved a claim of federal constitutional error, and the error did implicate federal constitutional rights, we would find the error harmless beyond a reasonable doubt.

b. *Exclusion of Evidence*

i. *Evidence of Canto's drug dealing and third party culpability*

Before trial the prosecution moved in limine to exclude 23 items of evidence proffered by defendant, which included, inter alia, two separate but

related areas of evidence of Canto's drug dealing: (1) circumstantial evidence of Canto's alleged drug-related activities as witnessed by his neighbors and family, and evidence of alleged drug-related items found in his home and in his possession at the time of his murder in Chicago in 1995; and (2) the statements of Melvin Walford and Cleveland James attesting to their involvement in Canto's drug dealing business and the details surrounding Canto's murder. Defendant had sought to introduce this evidence to challenge Canto's credibility by establishing Canto's status as a drug dealer, and to support his theory of third party culpability in the murders of Allen and her fetus.

The court excluded all of this proffered evidence. Defendant now claims that in doing so, the court abused its discretion and violated various of his constitutional rights. We conclude that the court abused its discretion in excluding some of the evidence but find no prejudice.

 The principles governing the admission of evidence are well settled. Only relevant evidence is admissible (Evid. Code, §§ 210, 350), "and all relevant evidence is admissible unless excluded under the federal or California Constitution or by statute. (Evid. Code, § 351; see also Cal. Const., art. I, § 28, subd. (d).)" (*People v. Heard* (2003) 31 Cal.4th 946, 973 [4 Cal.Rptr.3d 131, 75 P.3d 53].) "The test of relevance is whether the evidence tends 'logically, naturally, and by reasonable inference' to establish material facts such as identity, intent, or motive." (*People v. Garceau* (1993) 6 Cal.4th 140, 177 [24 Cal.Rptr.2d 664, 862 P.2d 664].) In determining the credibility of a witness, the jury may consider any matter that has a tendency in reason to prove or disprove the truthfulness of his testimony at the hearing, including but not limited to: a witness's character for honesty or veracity or their opposites; the existence or nonexistence of a bias, interest, or other motive; his attitude toward the action in which he testifies or toward the giving of testimony; and his admission of untruthfulness. (Evid. Code, § 780.) Past criminal conduct involving moral turpitude that has some logical bearing on the veracity of a witness in a criminal proceeding is admissible to impeach, subject to the court's discretion under Evidence Code section 352. (See *People v. Wheeler* (1992) 4 Cal.4th 284, 295–296 [14 Cal.Rptr.2d 418, 841 P.2d 938].) Possession of drugs for sale, which involves the intent to corrupt others, is conduct involving moral turpitude. (*People v. Castro* (1985) 38 Cal.3d 301, 317 [211 Cal.Rptr. 719, 696 P.2d 111].)

 The trial court has broad discretion in determining the relevance of evidence. (See *People v. Crittenden* (1994) 9 Cal.4th 83, 132 [36 Cal.Rptr.2d 474, 885 P.2d 887].) We review for abuse of discretion a trial court's rulings on the admissibility of evidence. (*People v. Heard, supra*, 31 Cal.4th at p. 972; *People v. Rowland* (1992) 4 Cal.4th 238, 264 [14 Cal.Rptr.2d 377, 841 P.2d 897].)

The proffered circumstantial evidence of Canto's alleged drug dealing included the following: Canto's ex-wife would have testified that she was married to Canto for 10 years and that the marriage ended nearly two years before his death, that he never held a "regular job," had "a lot of money," and traveled extensively, and she was of the opinion that he was a drug dealer; neighbors would have testified to a large amount of foot traffic at Canto's house at all hours of the day and night; Canto's coworker would have testified that he accompanied Canto when Canto drove to two homes and went inside for a short period of time, from which the coworker assumed Canto was delivering drugs; the coworker also would have testified he saw Canto carrying a concealed weapon and heard him admit to having "shot some Bloods in Chicago"; and police officers would have testified that the search of Canto's house following the murders revealed three bulletproof vests and a large amount of ammunition.[5]

The proffered statements of Walford and James, then awaiting trial in Chicago for Canto's murder, would have included contentions that they had been employed by Canto for several years to transport large quantities of cocaine between Los Angeles and Chicago, and that they shot and stabbed Canto, causing his death, after a disagreement during a drug deal in November 1995.

The trial court considered the admissibility of all of this evidence in a lengthy pretrial hearing on the motion in limine, and revisited the admissibility of the statements of Walford and James at the end of the prosecution's case-in-chief and again during defendant's case. When first considering the admissibility of the circumstantial evidence during the hearing on the motion, the court recognized that it knew very little about the case to come; indeed, it did not know of defendant's contention that he and Canto were dealing drugs, or of the statements of Walford and James and details of Canto's murder during the drug deal in Chicago. The court ruled the circumstantial evidence irrelevant, and stated, "clearly in the guilt phase the court sees no relevance of the defense's desire to see Mr. Canto as a narcotic dealer and to suggest that somebody else killed him or somebody else tried to kill him [and Allen] other than the defendant. [¶] That is far from being relevant third party culpability evidence. It simply seeks to cast doubt upon Mr. Canto and to, I assume, imply to the jury that others may have had reasons to want a drug dealer dead, all of which is absolutely speculative." The court also stated, "if, however, the defendant testifies that these matters become relevant based upon his testimony or any other defense witness, we will revisit the issue."

---

[5] Defendant also asserted that a search of Canto's Chicago residence following his murder revealed a large amount of marijuana, but he was unable at trial to produce evidence in support of the assertion.

Later, during the hearing on the motion, the court learned of and considered the admissibility of the proffered statements of Walford and James. The court concluded this did provide more substantial evidence of Canto's drug dealing and therefore did have a bearing on Canto's credibility, but the statements were hearsay, inadmissible as third party culpability evidence, substantially more prejudicial than probative, and therefore inadmissible.

During trial the court reconsidered the admissibility of the statements of Walford and James regarding Canto's murder. Defendant made an offer of proof that he would testify to his and Canto's drug dealing business and the details of the drug deal of the night of the murders on August 9, 1994, and argued the statements of Walford and James were relevant to challenge Canto's credibility and support defendant's contention that Canto was a drug dealer, as would the contention that Canto carried a gun and was believed by his coworkers to be a drug dealer. The court issued a written ruling, again finding the evidence of Canto's murder irrelevant, and the statements of Walford and James to be hearsay and substantially prejudicial and to be excluded pursuant to Evidence Code section 352, and inadmissible as third party culpability evidence pursuant to *People v. Hall* (1986) 41 Cal.3d 826, 834 [226 Cal.Rptr. 112, 718 P.2d 99].

We conclude that defendant's offer of proof that he would testify about Canto's drug dealing provided the foundation for the relevancy of the circumstantial evidence that had been missing when the court initially ruled on its admissibility. The circumstantial evidence suggesting Canto was a drug dealer was no longer speculative and was relevant and admissible to challenge Canto's credibility. (See *People v. Wheeler, supra,* 4 Cal.4th at pp. 295–296.) The court should have admitted the circumstantial evidence at this point.

However, the jury heard substantial other evidence challenging Canto's credibility: police officers testified that they found several boxes each of plastic wrap and fabric softener in Canto's house on West Marine Avenue, items often used to disguise distinctive odors in the packaging and transportation of large amounts of marijuana; Canto lied to the Gardena police when he said he did not know who shot him; he gave a false name on the rental application for the house on West Marine Avenue; he lied to the Chicago police before he died; he admitted he harbored bias and animosity toward defendant and wanted to "take care of business" and kill defendant himself; and defendant himself testified in detail to Canto's involvement in drug dealing. The exclusion of the circumstantial evidence of Canto's drug dealing did not keep the jury from learning facts from which it could assess Canto's character and credibility. No prejudice resulted from the court's decision to exclude the circumstantial evidence of Canto's drug dealing.

We find no error in excluding the statements of Walford and James. "To be admissible, the third party evidence need not show 'substantial proof of a probability' that the third person committed the act; it need only be capable of raising a reasonable doubt of defendant's guilt. At the same time, we do not require that any evidence, however remote, must be admitted to show a third party's possible culpability. As this court observed in [*People v.*] *Mendez* [(1924) 193 Cal. 39 [223 P. 65]], evidence of mere motive or opportunity to commit the crime in another person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt: there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime." (*People v. Hall, supra,* 41 Cal.3d at p. 833.) "[C]ourts should simply treat third-party culpability evidence like any other evidence: if relevant it is admissible ([Evid. Code,] § 350) unless its probative value is substantially outweighed by the risk of undue delay, prejudice, or confusion (§ 352)." (*People v. Hall, supra,* 41 Cal.3d at p. 834.)

Evidence regarding Canto's murder in Chicago would not raise a reasonable doubt as to defendant's culpability for the murder of Allen and her fetus. The prosecution established that defendant shot Canto, that defendant was in the house when Allen and her fetus were murdered, and that the same gun was used to shoot Canto and Allen. Defendant himself testified that he was dealing drugs with Canto and was in Canto's house when Allen was murdered. Neither party presented evidence, either direct or circumstantial, that placed Walford or James in Canto's house at any time. The fact that Canto was involved in drug dealing and was himself subsequently murdered by Walford and James in Chicago in November 1995, in the course of drug dealing, neither demonstrated that Walford or James was involved in the killings in Canto's house in August 1994, nor disproved the prosecution's theory that it was defendant who shot Allen. The court did not abuse its discretion in excluding these statements.

### ii. *Postmurder burglary of Canto's house*

The court also excluded evidence that seven weeks after the Allen murders, police caught and prevented burglars from taking furniture from Canto's house on West Marine Avenue, and that when notified of the attempted burglary of his home, Canto, who had only briefly returned to the house since being released from the hospital, told the police he was not interested in anything in the house and would not press charges. This evidence, defendant argues, challenged the critical element of the prosecution's case for robbery: that Allen's missing jewelry was taken at the time of the murders.

Several rings Allen always wore were missing when she was found dead. Some of her fingernails were broken, suggesting she engaged in a struggle in

the house before she died. The prosecution argued that it was reasonable to conclude that the killer took the missing rings. Defendant points out there was no inventory taken of the contents of the house after the murders, and argues that the proffered evidence of the postmurder burglary attempt was relevant to raise the possibility that the rings were not taken at the time of the murders, but were left in the house and later taken during the burglary.

The trial court properly excluded this evidence. The fact of an unsuccessful attempt to burglarize Canto's abandoned house weeks after the murders does not alone raise a reasonable inference that the missing rings were left in the house following the murders. Moreover, the court had discretion to exclude the evidence under Evidence Code section 352 even if we assume it had some marginal relevance.

Even if we were to find the court abused its discretion in excluding any or all of the proffered exculpatory evidence, including the statements of Walford and James and the prior burglary attempt, defendant has failed to establish a reasonable probability of a more favorable outcome in the absence of the error. At most, the additional evidence the jury would have heard was of marginal value. Indeed, for these reasons, we would find any error harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824].)

Defendant also argues the court impermissibly "conditioned" the admissibility of this proffered evidence on his testifying. Because he failed to raise this objection at trial (Evid. Code, § 354; *People v. Valdez* (2004) 32 Cal.4th 73, 108 [8 Cal.Rptr.3d 271, 82 P.3d 296]), defendant forfeited this argument on appeal. Moreover, the claim is without merit. The court did not suggest that the proffered evidence would become admissible only if defendant testified. Rather, the court indicated that as offered it was irrelevant, but if defendant offered other evidence, such as his own testimony, demonstrating Canto was a drug dealer, the court would revisit the admissibility and relevance of the proffered evidence.

## 2. *Alleged Prosecutorial Misconduct*

Defendant contends the prosecutor committed misconduct in a number of respects. "To constitute a violation of the federal Constitution, prosecutorial misconduct must ' "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process." ' [Citations.] Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves ' "the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury." ' " (*People v. Benavides, supra*, 35 Cal.4th at p. 108.)

After the preliminary hearing but before Canto's death, the prosecution filed a "Motion for Hearing To Determine Conflict of Interest" that raised a question whether a conflict of interest existed between defendant and his counsel, a deputy in the Los Angeles County Public Defender's Office. The prosecution stated that the public defender's office previously represented prosecution witness Canto. Defense counsel indicated that her office had evaluated the issue and concluded that there was no conflict. Court and counsel questioned whether the existence of a conflict was a matter of law or fact and whether that determination should be made by court or counsel, and the court scheduled a hearing on those issues.

Before the hearing was held, however, Canto died. The court determined his death rendered moot the question of whether a conflict existed, and, without objection, took the prosecution's motion off calendar. Counsel continued to represent defendant throughout the guilt and penalty phases of trial; defendant represented himself in propria persona at the motion for new trial.

Defendant characterizes the filing of the "Motion for Hearing To Determine Conflict of Interest" as prosecutorial misconduct, claiming the motion "sowed the seeds of distrust in appellant's mind that his counsel was representing interests in conflict with appellant's own and that counsel was not using her best efforts on his behalf," and "created an atmosphere of mistrust that ultimately resulted in the breakdown of the attorney-client relationship," all in violation of various constitutional rights.

■■■ Assuming for argument the issue was preserved, it is meritless. The prosecution had the right to protect itself. Whether a conflict of interest exists such that a defendant should have a different attorney is a very sensitive matter. The prosecution could legitimately be concerned that if the court had not examined the question, any conviction it received might have been doomed to reversal on appeal even before the trial began. (See, e.g., *People v. Mroczko* (1983) 35 Cal.3d 86 [197 Cal.Rptr. 52, 672 P.2d 835].) We see no impropriety in the prosecution's cautiously seeking a determination before trial whether a conflict existed rather than waiting for a defense challenge to a conviction after trial.

Moreover, the record does not suggest that defendant mistrusted counsel due to the prosecutor's conduct or that counsel failed to represent defendant adequately. Defendant did not reveal on the record the reason he chose to represent himself following the penalty phase, and on appeal he acknowledges that counsel did not have a conflict of interest. The trial court stated at the hearing on the motion for new trial that counsel "did everything she could throughout the trial to try to convince me to allow Mr. Canto's earlier statements to be impeached by his alleged drug dealing and all manner of

things. She took a position contrary to Mr. Canto. She was not afraid to do so. She urged me to find that he was a dope-dealing criminal and a liar, et cetera. I mean, everything that you would want your advocate to do, she did . . . . Her conduct at this trial belies any suggestion that she felt constrained or was constrained in any way. Just the opposite. She went after Canto like an attack dog, and I don't mean that in an uncomplimentary sense."

 Defendant next asserts that the prosecution caused three potential witnesses to Canto's murder in Chicago to change their minds about testifying on defendant's behalf, and thereby interfered with his right to compulsory process in violation of various constitutional rights. Prosecutorial intimidation of, or interference with, defense witnesses violates the Sixth Amendment right to compel the attendance of witnesses and the Fourteenth Amendment right to due process. (*People v. Coffman and Marlow, supra,* 34 Cal.4th at p. 52; *People v. Mincey* (1992) 2 Cal.4th 408, 460 [6 Cal.Rptr.2d 822, 827 P.2d 388]; *In re Martin* (1987) 44 Cal.3d 1, 29–30 [241 Cal.Rptr. 263, 744 P.2d 374].) Defendant bears the burden of demonstrating at least a reasonable possibility that the witness could have given testimony that would have been both material and favorable; that the prosecution engaged in activity that was entirely unnecessary to the proper performance of its duties and of such a character as to transform a defense witness from a willing witness to one who would refuse to testify; and a causal link between that misconduct and his inability to present witnesses on his own behalf. (*In re Martin, supra,* at pp. 31–32.) He has not met this burden.

Before trial, Detective Dempsey of the Riverdale, Illinois, police department cooperated with the defense and agreed to testify to the statements made by Walford that he killed Canto because Canto was a cheating drug dealer. In an effort to obtain Walford's and James's blood samples the prosecutor sent a fax to a state attorney's office in Illinois seeking the names and addresses of their attorneys. The fax read in part: "In The People versus Harris, the defense indicated in their opening statement that the defendant will testify and blame the 1994 Los Angeles crime on Mr. James and Mr. Walford. He will testify that in arriving at the scene, he saw the two exiting the house, the crime already completed. They finished in Chicago in 1995 what they started in Los Angeles in '94.[6] [¶] *The attorneys* [for Walford and James] *may wish to cooperate to avoid having their clients implicated, extradited, and prosecuted for capital murder in the state of California.*" (Italics added.)

---

[6] Actually, defense counsel had stated only, "Mr. Harris will describe for you when he arrived [at Canto's house] he was confronted by two men." Defendant later testified he could not identify the men.

Defense counsel stated that just before the in camera hearing regarding the admissibility of Walford's statement, she had been contacted by Illinois trial counsel for Walford and codefendant James who, presumably in response to the prosecution's inquiries, "wanted to know what her intentions were" with regard to their clients. She further stated that the defense had recently learned the prosecution had telephoned Detective Dempsey, and that Dempsey was now "not sure he would be able to testify."

Defendant argues, as he did below, that by contacting the state attorney's office in Illinois and Detective Dempsey, the prosecution unconstitutionally impeded his ability to present a defense. We disagree. Defendant's inability to present this evidence was not due to the witnesses' willingness or unwillingness to testify, but to the trial court's rulings *excluding* the evidence. Further, the record does not establish that before the prosecution sent the fax to Illinois, either Walford or James had been willing to testify on defendant's behalf, or, if they were, that the prosecution's actions negatively influenced Walford or James or Dempsey in their decisions not to testify.

Defendant also fails to establish that the evidence that might have been presented would have been both material and favorable to the defense. Even absent Walford's and James's statements regarding Canto's drug dealing, defendant had evidence with which to challenge Canto's credibility. By defendant's own admission, he and Canto were large-scale drug dealers, and defendant was inside Canto's house when Allen was murdered. The fact that two drug dealers in Chicago later murdered Canto does nothing to suggest that defendant was a victim rather than a perpetrator of this crime.

■ Defendant claims the prosecution engaged in misconduct by offering the evidence that he has claimed in this appeal the court should have excluded and opposing the admission of defense evidence the court did exclude. Defendant failed to object to this alleged misconduct and thus forfeited these claims on appeal. (*People v. Crew* (2003) 31 Cal.4th 822, 839 [3 Cal.Rptr.3d 733, 74 P.3d 820].) Moreover, phrasing the claim as one of misconduct adds nothing to the strength of defendant's evidentiary claims we have already considered. Although offering evidence the prosecutor *knows* is inadmissible may be misconduct (*People v. Scott* (1997) 15 Cal.4th 1188, 1218 [65 Cal.Rptr.2d 240, 939 P.2d 354]), the adversarial process generally permits one party to offer evidence, and the other party to object if it wishes, without either party being considered to have committed misconduct. The trial court simply rules on the admissibility of the evidence, as the court did here.

■ Defendant claims the prosecution engaged in misconduct when, after urging the court to find certain evidence had no probative value, it relied on

evidence of Canto's status as a drug dealer in its guilt phase closing argument. Again, he failed to object to this alleged misconduct and thus forfeited the claim on appeal. Moreover, contrary to defendant's argument, the prosecution did not "rely on the fact Canto was a drug dealer to bolster his argument about [defendant's] motivations to commit the crime." Rather, the prosecution commented on defendant's own testimony and stated, "if you want to believe Canto was a drug dealer, that's even more reason he's going to have some dope in there worth stealing, and maybe a lot more cash." The prosecution is given wide latitude during closing argument to make fair comment on the evidence, including reasonable inferences or deductions to be drawn from it. (*People v. Wharton* (1991) 53 Cal.3d 522, 567 [280 Cal.Rptr. 631, 809 P.2d 290].) We find no misconduct.

Relying on testimony, largely from defendant himself, that he earned $150 a week plus commissions from the auto body shop, that his July and August 1994 rent checks for $695 each were returned for insufficient funds, that he was indebted to Canto for $1,500, and that at the time he left the auto body shop he still owed money on a $500 car he had purchased from owner Lyndon Bull, the prosecution argued in closing at the guilt phase of trial that defendant was in debt, needed money, and therefore had the "motive and opportunity to pull a robbery." Defendant claims this argument constituted misconduct. Because defendant failed to object or seek an admonition as to this asserted instance of misconduct, and because an admonition would have cured the alleged harm, defendant has forfeited the claim for appeal. (*People v. Dennis* (1998) 17 Cal.4th 468, 517–518 [71 Cal.Rptr.2d 680, 950 P.2d 1035]; *People v. Ochoa* (1998) 19 Cal.4th 353, 427–428 [79 Cal.Rptr.2d 408, 966 P.2d 442].) In any event, the claim has no merit.

It is true that "[e]*vidence* of a defendant's poverty or indebtedness generally is inadmissible to establish motive to commit robbery or theft, because reliance on poverty alone as evidence of motive is deemed unfair to the defendant, and the probative value of such evidence is considered outweighed by the risk of prejudice." (*People v. Wilson* (1992) 3 Cal.4th 926, 939 [13 Cal.Rptr.2d 259, 838 P.2d 1212], italics added.) But here, the evidence was already presented without objection, largely from defendant's own mouth. The prosecutor merely commented on that evidence, which was proper.

Moreover, evidence of a defendant's poverty may be admissible to refute a contention that he did not commit the offense because he did not need the money. (*People v. Koontz* (2002) 27 Cal.4th 1041, 1076 [119 Cal.Rptr.2d 859, 46 P.3d 335].) Such is the case here. Defendant testified on direct examination that he was not having financial difficulties in the summer of 1994. He testified at length to the thousands of dollars in profits he earned dealing drugs, and stated that "between his various activities" his income

would fluctuate from week to week. He acknowledged that his rent checks bounced but explained it was due to his and his roommate's negligence in depositing paychecks and not because of an actual lack of funds on his part. The prosecution properly refuted defendant's assertion that he was not in financial need at the time of the crimes and the inference that he had no financial motive to commit robbery.

### 3. *Alleged Judicial Bias*

Defendant claims the trial court harbored a bias against him. He asserts the bias was demonstrated in several allegedly erroneous evidentiary rulings and in inappropriate comments and conduct by the court. In particular, he claims the court exhibited bias against him when it made direct statements of disbelief of defendant's case; interjected its own objection during the cross-examination of a police officer regarding a possible unidentified witness; interjected its own objection during cross-examination of a police officer regarding the bullets found in Canto's apartment; made disparaging remarks to defense counsel during cross-examination of the evidence technician; interjected its own objection during cross-examination of the fingerprint technician regarding prints on the gun and the gathering of blood evidence; and conducted its own cross-examination of defendant.

Defendant challenged only the court's interruption of the cross-examination of the evidence technician regarding possible fingerprints on the gun, but he did not object to any of the other judicial interruptions or resulting evidentiary rulings, or to his cross-examination by the court. Although defendant failed to object to the allegedly improper acts on the grounds of judicial bias or seek the judge's recusal (see *People v. Snow* (2003) 30 Cal.4th 43, 78 [132 Cal.Rptr.2d 271, 65 P.3d 749]; *People v. Seaton* (2001) 26 Cal.4th 598, 698 [110 Cal.Rptr.2d 441, 28 P.3d 175]; *People v. Hines* (1997) 15 Cal.4th 997, 1041 [64 Cal.Rptr.2d 594, 938 P.2d 388]; *People v. Wright* (1990) 52 Cal.3d 367, 411 [276 Cal.Rptr. 731, 802 P.2d 221]; Code Civ. Proc., § 170.1, subds. (a)(6)(C), (c)), we need not decide whether defendant has forfeited this claim because it lacks merit. A review of each complained-of act by the trial court reveals no evidence the trial judge was biased against defendant.

 Although "the trial court has both the duty and the discretion to control the conduct of the trial" (*People v. Snow, supra*, 30 Cal.4th 43; see *People v. Fudge* (1994) 7 Cal.4th 1075, 1108 [31 Cal.Rptr.2d 321, 875 P.2d 36]), "the Due Process Clause clearly requires a 'fair trial in a fair tribunal,' *Withrow v. Larkin*, 421 U.S. 35, 46 [43 L.Ed.2d 712, 95 S.Ct. 1456, 1464] (1975), before a judge with no actual bias against the defendant or interest in the outcome of his particular case. See, *e.g., Aetna* [*Life Ins. Co. v. Lavoie*

(1986) 475 U.S. 813, 821–822 [89 L.Ed.2d 823, 106 S.Ct. 1580]; *Tumey* [*v. Ohio* (1927) 273 U.S. 510, 523 [71 L.Ed. 749].)" (*Bracy v. Gramley* (1997) 520 U.S. 899, 904–905 [138 L.Ed.2d 97, 117 S.Ct. 1793].) The role of a reviewing court "is not to determine whether the trial judge's conduct left something to be desired, or even whether some comments would have been better left unsaid. Rather, we must determine whether the judge's behavior was so prejudicial that it denied [the defendant] a fair, as opposed to a perfect, trial. (*United States v. Pisani* (2d Cir. 1985) 773 F.2d 397, 402.)" (*People v. Snow, supra*, 30 Cal.4th at p. 78.) In deciding whether a trial court has manifested bias in the presentation of evidence, we have said that such a violation occurs only where the judge " 'officiously and unnecessarily usurp[ed] the duties of the prosecutor . . . and in so doing create[d] the impression that he [was] allying himself with the prosecution.' " (*People v. Clark* (1992) 3 Cal.4th 41, 143 [10 Cal.Rptr.2d 554, 833 P.2d 561].) This principle was not violated here.

At a midtrial hearing out of the presence of the jury regarding the admissibility of evidence of Canto's murder in Chicago, the court stated, "What is giving me a little bit of pause is defendant is arrested at time one, makes no reference to this elaborate offer, then Mr. Canto dies, and my cynical self tells me that what happens is once Mr. Canto dies and defendant is provided with the details of that incident lo and behold—and I'd bet my right arm on it—for the first time the defendant is now talking about bad guys from Chicago. . . . It is almost too good to be true for the defendant." And "[I] would be mighty curious if I could look into your mind and that of Mr. Harris's as to when this defense arose, when the facts arose that jibe so neatly with the statement of two arrestees in Chicago." The court did not, as defendant argues, exhibit bias in these statements, but simply commented on aspects of the evidence out of the presence of the jury. This falls far short of "betray[ing] a bias against defense counsel." (*People v. Wright, supra*, 52 Cal.3d at p. 411.)

Officer King, one of the first police officers on the scene at Canto's house, testified to having interviewed several of the eyewitnesses, including a man who had flagged him down at the crime scene. An unidentified woman accompanied that man. On cross-examination, defense counsel asked the officer if he had seen any other officers interviewing the eyewitness or the unidentified woman. The court interrupted on its own motion and prevented the officer from answering the question, stating the information sought was irrelevant. Counsel explained she did not intend to call as witnesses any of the other officers or the eyewitness or the unidentified woman, and the court sustained its own objection. In curbing vague questions about unknown persons, the court did not ally itself with the prosecution but rather exercised reasonable control of the trial to avoid irrelevant or unduly prolonged testimony. (*People v. Fudge, supra*, 7 Cal.4th at p. 1108.)

The court interrupted the examination of a police officer and challenged the relevancy of questions regarding a gun found in Canto's home and the number of bullets found in the bedroom dresser. Again, defendant fails to show this evidences judicial bias against defendant; the court challenged questions posed to this witness by both the prosecution and defense.

The court interrupted defendant's cross-examination of the prosecution's evidence technician. Defense counsel attempted to ask her if fingerprints could have been found on the magazine inside the gun discovered in the driveway of Canto's home. Over defense's argument that the questions were relevant, the court declared them to be a "waste of time" because the technician had already testified that no fingerprints had been found on the gun. Later, after the technician testified she had "collected one solid swatch from the stain" in the driveway, defense counsel asked if the technician made an effort to collect the "entire bloodstain." The court declared the question to be "meaningless" because "I don't know how anyone could know if they were successful in obtaining an entire stain off of the driveway." In so ruling, the court properly exercised its discretion to expedite the examination of witnesses by curbing repetitious questioning.

Nor, as defendant contends, did the court exhibit a hostile or rancorous attitude toward defendant when it asked defense counsel to "move on" when she attempted again to elicit information regarding the ammunition found in Canto's house.

Finally, defendant asserts the court displayed bias against him when the court itself asked the following questions of defendant, without objection, after the prosecution's cross-examination:

"Court: When you were in the house, you say you heard a gun go off? Who did you figure was being shot?

"Defendant: I thought I was being shot at.

"Court: At some point did it dawn on you that perhaps somebody else had been shot in the house?

"Defendant: No.

"Court: Never did?

"Defendant: No.

"Court: Did you think that Mr. Canto might be in there?

"Defendant: Yes, I figured it was a possibility he was in there.

"Court: You didn't see him, though?

"Defendant: No.

"Court: Did you think the young lady might be in there?

"Defendant: No, because I haven't seen her. I didn't see her earlier when I was there.

"Court: You didn't think she was home?

"Defendant: No, I didn't.

"Court: Did you ever call the house later on to see if anybody got killed?

"Defendant: No, I didn't.

"Court: Why not?

"Defendant: Just never crossed my mind.

"Court: Didn't?

"Defendant: No.

"Court: Weren't you curious?

"Defendant: I was more distraught.

"Court: In the next couple of days did you ever call the house or try to contact Mr. Canto?

"Defendant: Like I said, I believe it was the next day that I read the newspaper.

"Court: You said two days later.

"Defendant: I believe it was either that day or the next day.

"Court: It wouldn't be in the next morning's paper since it happened so late.

"Defendant: I couldn't say for sure. I couldn't say what day it was.

"Court: You never called to find out what happened?

"Defendant: No.

"Court: Never did?

"Defendant: No.

"Court: You were ignorant of it until you read it in the paper?

"Defendant: Yes."

**(20)** Evidence Code section 775 " ' "confers upon the trial judge the power, discretion and affirmative duty . . . [to] participate in the examination of witnesses whenever he believes that he may fairly aid in eliciting the truth, in preventing misunderstanding, in clarifying the testimony or covering omissions, in allowing a witness his right of explanation, and in eliciting facts material to a just determination of the cause." ' ([*People v. Carlucci* (1979) 23 Cal.3d 249,] 256 [152 Cal.Rptr. 439], quoting Gitelson, *A Trial Judge's Credo* (1966) 7 Santa Clara L.Rev. [at pp.] 13–14.) [¶] The constraints on the trial judge's questioning of witnesses in the presence of a jury are akin to the limitations on the court's role as commentator. The trial judge's interrogation 'must be . . . temperate, nonargumentative, and scrupulously fair. The trial court may not . . . withdraw material evidence from the jury's consideration, distort the record, expressly or impliedly direct a verdict, or otherwise usurp the jury's ultimate factfinding power.' (*People v. Rodriguez* (1986) 42 Cal.3d 730, 766 [230 Cal.Rptr. 667, 726 P.2d 113].)" (*People v. Hawkins* (1995) 10 Cal.4th 920, 948 [42 Cal.Rptr.2d 636, 897 P.2d 574].)

■ Defendant argues the court overstepped its bounds with respect to the tone, form, and number of questions posed. However, he did not object to the trial court's questioning, thus making the claim not cognizable on appeal. (*People v. Corrigan* (1957) 48 Cal.2d 551, 556 [310 P.2d 953].) Were we to reach the merits, we would not endorse all of the trial court's questioning quoted above and, indeed, would find some of it inappropriate. On the facts of this case, however, we find no prejudice. We must assume that jurors followed their instruction not to "disbelieve any witness" or to decide the facts based on anything the court said or did, and to disregard any intimations or suggestions the court may have made regarding the believability of any witness. (CALJIC No. 17.32.) Further, the evidence of guilt was strong and the weaknesses in defendant's assertions of innocence would have been apparent to the jury even absent the court's questions. It is not reasonably

probable the jury would have reached a different guilt verdict had the court refrained from asking these questions. (*People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 247].)

### 4. *Instructional Claim*

Defendant contends the court erred in instructing the jury pursuant to CALJIC Nos. 2.01 and 2.02 regarding the use of circumstantial evidence. He argues that by informing the jury, "if one interpretation of the evidence appears to you to be reasonable and the other interpretation to be unreasonable, it would be your duty to accept the reasonable interpretation and reject the unreasonable," the court permitted the jury to base a finding of guilt on a degree of proof less than beyond a reasonable doubt. We have repeatedly rejected similar claims, and do so again here. (*People v. Bradford* (1997) 15 Cal.4th 1229, 1346 [65 Cal.Rptr.2d 145, 939 P.2d 259].)

### C. *Penalty Phase Issues*

#### 1. *Evidentiary Claims*

##### a. *Introduction of Victim Impact Evidence*

Defendant contends that the court erred in admitting victim impact evidence. The Eighth Amendment to the federal Constitution permits the introduction of victim impact evidence, or evidence of the specific harm caused by the defendant, when admitted in order for the jury to assess meaningfully the defendant's moral culpability and blameworthiness. (*Payne v. Tennessee* (1991) 501 U.S. 808, 825 [115 L.Ed.2d 720, 111 S.Ct. 2597].) Such evidence violates the Fourteenth Amendment's due process clause when it is so unduly prejudicial that it renders the trial fundamentally unfair. (*Ibid.*) Under California law, victim impact evidence is generally admissible as a circumstance of the crime pursuant to section 190.3, factor (a). (*People v. Boyette* (2002) 29 Cal.4th 381, 443–444 [127 Cal.Rptr.2d 544, 58 P.3d 391]; *People v. Stanley* (1995) 10 Cal.4th 764, 832 [42 Cal.Rptr.2d 543, 897 P.2d 481].) " 'On the other hand, irrelevant information or inflammatory rhetoric that diverts the jury's attention from its proper role or invites an irrational, purely subjective response should be curtailed.' " (*People v. Edwards* (1991) 54 Cal.3d 787, 836 [1 Cal.Rptr.2d 696, 819 P.2d 436], quoting *People v. Haskett* (1982) 30 Cal.3d 841, 864 [180 Cal.Rptr. 640, 640 P.2d 776].)

Defendant renews his objections at trial to the admission of the statements of Allen's mother and grandmother regarding viewing Allen's body at the mortuary, and the photographs of her gravesite. The evidence was properly

admitted. As a circumstance of the crime, the condition of the victim's body is a factor relevant to penalty. (*People v. Smithey* (1999) 20 Cal.4th 936, 990 [86 Cal.Rptr.2d 243, 978 P.2d 1171].) The brief descriptions by Allen's mother and grandmother of what they saw at the mortuary were far less graphic and disturbing than routine autopsy photographs we have previously allowed as proof of the condition of a victim's body (e.g., *ibid.*), and the court did not err in admitting this evidence. The photograph of Allen's gravesite was further evidence relating to her death and the effect upon her family, and was properly admitted as a circumstance of the murders.

Defendant also challenges the admission of evidence of a specific event at the funeral. Allen's mother, Pamela Gunn, and Allen's grandmother testified that at the end of the funeral service, the lid to the closed casket mistakenly was opened as it was being put into the hearse, and that several attendees screamed in horror and two people fainted, one falling on the top of the partially opened casket. Defendant did not object to this testimony at trial and thus forfeited the claim for purposes of appeal. (*People v. Davenport* (1995) 11 Cal.4th 1171, 1205 [47 Cal.Rptr.2d 800, 906 P.2d 1068].) Had defendant objected, the trial court probably should have excluded this specific testimony. The mistake by funeral home personnel in allowing the casket lid to be opened in sight of the mourners, and the screaming and fainting of funeral attendees that resulted, was too remote from any act by defendant to be relevant to his moral culpability. But, assuming defense counsel should have objected, we find no reasonable probability of prejudice. (*In re Scott* (2003) 29 Cal.4th 783, 811 [129 Cal.Rptr.2d 605, 61 P.3d 402].) The testimony was very brief, consuming no more than 16 lines of transcript, and was not significant in light of the emphasis placed in the penalty phase on the effect of the crime itself on the victim's family, the brutality of the murders, and the paucity of significant mitigating circumstances. Indeed, for these reasons we would find the admission of this evidence harmless beyond a reasonable doubt. (*Chapman v. California, supra,* 386 U.S. 18.)

### b. *Exclusion of Evidence*

Defendant argues the court erred in excluding evidence that was relevant pursuant to section 190.3, factors (a) (circumstances of the offense), and (e) (whether the victim was a participant in or consented to the homicidal act), to rebut the prosecution's penalty phase evidence, and in mitigation.

 "The Eighth and Fourteenth Amendments require the jury in a capital case to hear any relevant mitigating evidence that the defendant offers, including ' "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." ' ([*People v.*] *Frye* [(2004)] 18 Cal.4th [894,] 1015

[77 Cal.Rptr.2d 25, 959 P.2d 183].) In turn, the court does have the authority to exclude, as irrelevant, evidence that does not bear on the defendant's character, record, or circumstances of the offense. (*Ibid.*) '[T]he concept of relevance as it pertains to mitigation evidence is no different from the definition of relevance as the term is understood generally.' (*Id.* at pp. 1015–1016.) Indeed, 'excluding defense evidence on a minor or subsidiary point does not impair an accused's due process right to present a defense.' (*People v. Fudge*[, *supra*, 7 Cal.4th at p.] 1103.)" (*People v. Ramos* (2004) 34 Cal.4th 494, 528 [21 Cal.Rptr.3d 575, 101 P.3d 478].)

Under this standard, we find no error.

Before trial, and again before the penalty phase, defendant moved to admit evidence that Canto's ex-wife had warned Allen that Canto was dangerous and that living in the same house with him could get her killed; that Allen had actual knowledge of Canto's drug dealing; and that Allen in the past had used a false driver's license. Defendant proffered the evidence to establish that Allen's choice to live with Canto contributed to her own death. The court refused to admit the proffered evidence. Defendant argues the evidence was admissible to show Allen was not the innocent victim portrayed by the prosecution but rather a person who made voluntary choices to live in a dangerous situation and maintain a lifestyle that contributed to her death. We disagree. Contrary to the implications in the concurring and dissenting opinion, the proffered evidence did not show that Allen participated in or was otherwise associated with Canto's or defendant's criminal activities. The fact that Allen had a false driver's license and may have known that she was living in a dangerous situation did not constitute evidence that she participated in or consented to the acts leading up to her murder. The trial court did not err in excluding the proffered evidence as irrelevant.

The defense proffered the testimony of Pamela Gunn, Allen's mother, that she had been told by others that Canto was "trouble." The defense sought to establish that the anguish and grief Gunn testified to in the penalty phase was not attributable to Allen's death, but rather to Gunn's own guilt at her failure to intercede in the dangerous circumstance in which her daughter was living. We find no error in the exclusion of this testimony. "Testimony from the victims' family members was relevant to show how the killings affected *them*, not whether they were *justified* in their feelings due to the victims' good nature and sterling character. Accordingly, defendant was not entitled to disparage the character of the victims" in rebuttal. (*People v. Boyette*, *supra*, 29 Cal.4th at p. 445.)

Defendant also argues the court erred in predicating the admission of this proffered evidence on defendant's testifying on his own behalf. It did not do

so. The court merely indicated that should the defense introduce evidence, either from defendant or another source, that Allen participated in the drug activities of Canto and defendant, the court would revisit the question.

Defendant again proffered the evidence regarding Canto's drug dealing that was excluded in the guilt phase, including observations of Canto's family, coworkers, and neighbors and their opinions that Canto was dealing drugs, Walford's statements regarding the murder of Canto in Chicago during a drug deal, Canto's possession of bulletproof vests and large amounts of ammunition, and his admission to having shot people in Chicago. In addition, defendant proffered evidence that Canto had been shot in the leg 19 months before August 9, 1994. He argued the evidence would allow the jury to assess the aggravating nature of the crimes in the appropriate context. The court excluded the proffered evidence regarding Canto's murder as more prejudicial than probative pursuant to Evidence Code section 352, and the remaining proffered evidence as irrelevant to factors in mitigation.

Defendant now argues if the jury had been aware of this additional evidence of Canto's drug dealing and subsequent drug-related murder, they would have understood Allen's murder "was the result of Bernard Canto's drug dealing and not a cold blooded robbery by [defendant]." He argues the evidence would have "minimized the aggravating nature of the crime" and served as a basis for a sentence of less than death. Again, we believe the court acted within its discretion in excluding this evidence as irrelevant to Allen's murder. Defendant murdered *Allen*, not Canto. But even if the court should have admitted it, we find any error harmless beyond a reasonable doubt. We see no reasonable possibility the evidence regarding Canto's status as a drug dealer would have led to a sentence of less than death. The jury determined that defendant bound, gagged, and shot Allen to death in her own home. That the robbery and murder might have been connected to the fact that Allen was associated with Canto, who earlier that evening participated in a large-scale drug deal during which defendant sold Canto fake cocaine, bore no relevance to the assessment of the severity of the crime. Defendant's moral culpability remains essentially the same. The jury's evaluation of defendant's responsibility for his actions inside the house on the night of August 9, 1994, would not have changed with additional evidence that the fiancé of the woman he murdered was a large-scale drug dealer.

### 2. *Limitations on Defendant's Arguments*

#### a. *Arguments Regarding Individual Juror Responsibility*

Defendant argues the court placed unconstitutional limits on his penalty phase arguments on four occasions, by prohibiting counsel from speaking

about the jurors' direct and individual responsibility for defendant's fate. He argues the court lessened the jurors' sense of the "awesome responsibility" inherent in the penalty decision, thereby violating his Eighth Amendment right to reliability in the determination that death is the appropriate punishment. We disagree.

"The right to present closing argument at the penalty phase of a capital trial, while broad in scope, 'is not unbounded . . . ; the trial court retains discretion to impose reasonable time limits and to ensure that argument does not stray unduly from the mark.' " (*People v. Boyette, supra,* 29 Cal.4th at p. 463.) Juror determinations may not be the product of "emotional responses that are not rooted in the aggravating and mitigating evidence introduced during the penalty phase," or "extraneous emotional factors." (*California v. Brown* (1986) 479 U.S. 538, 542–543 [93 L.Ed.2d 934, 107 S.Ct. 837].) Nor may jurors be misled "to minimize the importance of [their] role," or "to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." (*Caldwell v. Mississippi* (1985) 472 U.S. 320, 328–329, 333 [86 L.Ed.2d 231, 105 S.Ct. 2633].)

As will appear, none of the limitations placed by the trial court could have had the effect of misleading the jury, permitting them to act upon emotional responses, or diminishing their sense of individual, personal responsibility for the verdict. Instead, the court prohibited counsel from improperly inflating the jurors' sense of their responsibility. We thus find defendant's Eighth Amendment argument unconvincing.

In the first instance, the court stopped counsel from arguing that the decision the jurors would make as to penalty would have an "enormous impact" not only on defendant, but also on his family, his attorneys, and on each juror himself or herself. Counsel asserted that she was seeking to urge the importance of the "individual verdict" of each juror. The court correctly disagreed; counsel's argument improperly sought to engage the jurors' sympathies for defendant's family and friends. Such sympathies have no bearing on the individualized nature of the penalty decision. (*People v. Bemore* (2000) 22 Cal.4th 809, 855–856 [94 Cal.Rptr.2d 840, 996 P.2d 1152] [sympathy for defendant's loved ones and their reaction to a death verdict do not relate to either the circumstances of the capital crime or the character and background of the accused].) Further, the court correctly stopped counsel from improperly addressing as a factor in mitigation the emotional impact a death verdict would have upon each juror. The jurors' reactions to the penalty imposed would constitute emotional responses "untethered to the facts of the case" (*People v. Boyette, supra,* 29 Cal.4th at p. 444), not proper factors for consideration.

■ In the second instance, the prosecution objected when defense counsel began to argue that a sentence of life without the possibility of parole would protect society. In sustaining the objection the court correctly stated that the jury was not to consider the "underpinnings of death penalty law" or "attempt to protect society at large." We have long held that the jury should not concern itself with protecting society. (*People v. Benson* (1990) 52 Cal.3d 754, 807 [276 Cal. Rptr. 827, 802 P.2d 330] [questions of deterrence or cost in carrying out capital sentence are for Legislature, not for jury considering a particular case]; *People v. Love* (1961) 56 Cal.2d 720, 731 [16 Cal.Rptr. 777, 366 P.2d 33] [misconduct to argue general deterrent effect of capital punishment].)

■ In the third instance, the court stopped defense counsel from arguing that if any one of the jurors voted for life imprisonment instead of death, defendant "will not be executed." In so doing, the court correctly prohibited counsel from erroneously telling the jury that a deadlocked verdict would result in a life sentence. (§ 190.4, subd. (b) [if jury unable to reach unanimous verdict as to penalty, court shall dismiss jury and impanel new jury to try issue of penalty].)

In the fourth instance, the court sustained the prosecution's objection when defense counsel began to argue that in Utah, the death sentence is carried out by firing squad. In the presence of the jury the court explained, "I understand what you were getting to, the marksmen, and the bullets, and so forth, the manner in which they are . . . . That has nothing to do with this case." Later, out of the presence of the jury, the court explained that it would not allow counsel to equate jurors with "executioners standing in a firing squad." Defendant renews the arguments presented below, arguing that the court limited his ability to impress upon the jury the seriousness of their role in sentencing in violation of the Eighth Amendment, citing *Caldwell v. Mississippi, supra*, 472 U.S. 320.

■ We disagree. *Caldwell*'s prohibition against misleading the jury as to the importance of their role "is relevant only to certain types of comment—those that mislead the jury as to its role in the sentencing process in a way that allows the jury to feel less responsible than it should for the sentencing decision." (*Darden v. Wainwright* (1986) 477 U.S. 168, 184, fn. 15 [91 L.Ed.2d 144, 106 S.Ct. 2464].) The limitation on counsel's argument here did not result in the suggestion that the jurors bore less responsibility than they actually did. Instead, it prevented the improper suggestion that the jurors had more responsibility than they actually did and that each one of their votes was akin to a live round of ammunition shot by a firing squad. Such an argument would have mischaracterized the jurors' role in the penalty phase and engendered an emotional response "not rooted in the aggravating and

mitigating evidence introduced during the penalty phase." (*California v. Brown, supra,* 479 U.S. at p. 542.)

Contrary to defendant's argument, the jurors were aware of the "awesome responsibility" inherent in the decision before them and of their individual responsibility for the verdict. The prosecutor began his argument by referring to the "very important, very serious decision," defense counsel referred to the "terrible decision," the "grievous" and "great and heavy" responsibility which will "remain with [the jurors]," and numerous times counsel referred to the "individual decision" which would involve the "moral conscience" of each juror.

In sum, none of the limitations imposed on defendant's penalty phase argument affected the reliability of the verdict.

b. *Arguments Regarding Defendant's Lack of Violent Criminal History*

In closing argument to the jury, the prosecutor argued that if defendant received a sentence of life without the possibility of parole, he could commit crimes in prison without fear of greater punishment. Defense counsel objected that the prosecutor was improperly arguing future dangerousness. The court sustained the objection and admonished the jury "to disregard the comments about how the defendant might behave, or what crimes might be committed in the future." Later, during her closing argument, defense counsel argued without objection that the prosecution had not presented any evidence of prior acts of violence by defendant, and that specifically there was no evidence of acts of violence during defendant's federal or present incarceration. Counsel also argued, "What would be one of the most fundamental concerns you are going to have? Is society protected? And as [the prosecutor] pointed out, and correctly so, our prisons are a part of society. Is society protected? Clearly, this man, Mr. Harris, has demonstrated—" At this point, the court interrupted and said, "I did it for the People, I'm going to do it for the defense, that's not part of this game. . . . [T]he jury is not being asked at this point to render a decision on penalty to protect society the best way. That would invite them to speculate too much. So I'm going to not let you do it either." Defense counsel then continued to argue, without objection or interruption, that the absence of any "evidence whatsoever of any acts of violence or threat of violence" was "heavily mitigating" under section 190.3, factor (b) (presence or absence of criminal activity involving force or violence).

Defendant claims the court prevented him from presenting his lack of violent criminal history as a factor in mitigation and from urging the jury

to consider that because he was not a violent prisoner in the past, he would not be a risk to other prisoners should he receive a sentence of life without the possibility of parole. The court did err to the extent it believed neither side could argue defendant's future dangerousness. The prosecution may argue future dangerousness if the argument is based on the evidence. (*People v. Champion* (1995) 9 Cal.4th 879, 940 [39 Cal.Rptr.2d 547, 891 P.2d 93].) Accordingly, the defense may argue the opposite. But any error in this case was harmless. Defendant actually gained to the extent he prevented the prosecution from arguing that he might commit crimes in prison. Moreover, defendant was able to argue fully the mitigating impact of his absence of a history of violence while incarcerated. We see no reasonable possibility the verdict would have been different had the court permitted both sides to argue future dangerousness.

### 3. Instructional Claims

#### a. Victim-impact Instructions

At the close of the penalty phase, defendant requested, and the court refused to give, the following instruction: "Evidence has been introduced for the purpose of showing the specific harm caused by the defendant's crime. Such evidence, if believed, was not received and may not be considered by you to divert your attention from your proper role of deciding whether defendant should live or die. You must face this obligation soberly and rationally, and you may not impose the ultimate sanction as a result of an irrational, purely subjective response to emotional evidence and argument. On the other hand, evidence and argument on emotional though relevant subjects may provide legitimate reasons to sway the jury to show mercy."

The court did instruct the jury, as requested by the prosecution, that "[if] supported by the evidence, it is proper to consider the impact of the murder on the victim's family (including their pain and suffering) when determining the appropriate penalty. You are further instructed that such evidence is to be included within the meaning of factor (a), the circumstances of the offenses, in the preceding instruction (CALJIC No. 8.85) and is not a separate factor in aggravation."

Defendant contends that the court thus instructed the jury on victim-impact evidence in an uneven and unfair manner, interfering with the jury's discretion to give whatever weight it chose to any factor in mitigation or aggravation, and allowing the jury to make a decision based upon emotion or sympathy for the victims rather than upon logic and rationality.

We disagree. The instruction given properly informed the jury of the law regarding victim-impact evidence. (*People v. Edwards, supra,* 54 Cal.3d

at p. 835 [§ 190.3, factor (a), allows evidence and argument on specific harm caused by defendant, including impact on family of victim].) The court properly rejected the defense-proffered instruction as confusing; the instruction was unclear as to whose emotional reaction it directed the jurors to consider with caution—that of the victim's family or the jurors' own. Further, the instructions given as a whole did not give the jurors the mistaken impression that they could consider emotion over reason, nor did the instructions improperly suggest what weight the jurors should give to any mitigating or aggravating factor.

### b. Lingering Doubt Instructions

The court also refused to give three instructions requested by defendant regarding lingering doubt.[7] Contrary to defendant's argument, although it is proper for the jury to consider lingering doubt (*People v. Slaughter* (2002) 27 Cal.4th 1187, 1219 [120 Cal.Rptr.2d 477, 47 P.3d 262]), there is neither a state nor a federal constitutional requirement that the jury be specifically instructed that it may do so. (*Franklin v. Lynaugh* (1988) 487 U.S. 164, 173–174 [101 L.Ed.2d 155, 108 S.Ct. 2320]; *People v. Lawley* (2002) 27 Cal.4th 102, 166 [115 Cal.Rptr.2d 614, 38 P.3d 461].) The lingering doubt concept is sufficiently encompassed in other instructions ordinarily given in capital cases. (*People v. Hines, supra,* 15 Cal.4th at p. 1068.) The court did not err in refusing to instruct as defendant requested.

### c. CALJIC Nos. 8.84.1 and 8.85

Defendant contends that CALJIC Nos. 8.84.1 and 8.85, in directing the jury in the penalty phase to determine what the facts are from the evidence received during the entire trial, unconstitutionally allowed the consideration of nonstatutory aggravating circumstances in the determination of penalty. We have held otherwise. (*People v. Taylor* (2001) 26 Cal.4th 1155, 1180 [113 Cal.Rptr.2d 827, 34 P.3d 937] [standard sentencing instructions proper despite failure to limit aggravating evidence to factors enumerated in § 190.3].)

---

[7] Defendant requested the following instructions: (1) "The adjudication of guilt is not infallible and any lingering doubt you entertain on the question of guilt may be considered by you in determining the appropriate penalty." (2) "It may be considered as a factor in mitigation if you have a lingering doubt as to the guilt of the defendant." (3) "A juror who voted for conviction at the guilt phase may still have a lingering or residual doubt whether the defendant was the actual killer. Such a lingering or residual doubt, although not sufficient to raise a reasonable doubt at the guilt phase, may still be considered as a mitigating factor at the penalty phase. Each juror may determine whether any lingering or residual doubt is a mitigating factor and may assign it whatever weight the juror feels appropriate."

#### d. *CALJIC No. 8.86*

Defendant testified at the guilt phase that he had been convicted of federal drug possession charges in 1988 and was incarcerated in a federal prison until August 1993. At the penalty phase the parties stipulated to the prosecution's introduction of documentation from the United States Department of Justice regarding defendant's 1988 federal conviction and incarceration for drug possession. This eight-page "prison packet" included detailed information about the prior conviction.

In closing argument the prosecutor referred to defendant's prior conviction, stating defendant "collided with the criminal justice system and he didn't learn from his mistakes. He didn't get any better, he got worse. And if you recall from his testimony itself, as soon as he was released from federal prison, he went back to drug dealing. It shows a person who has very little ability to be reformed, to repent his prior conviction. That is significant when you analyze the man. So that definitely is a factor in aggravation."

Defendant argues that in light of the introduction of the federal "prison packet," the court prejudicially erred in refusing to instruct sua sponte with CALJIC No. 8.86, which requires the jury to find beyond a reasonable doubt that defendant was convicted of a prior crime before the prior crime can be considered as an aggravating circumstance.

Normally such an instruction is required, even absent a request, when evidence of prior crimes is introduced or referred to as an aggravating factor pursuant to section 190.3, factor (c). (*People v. Davenport* (1985) 41 Cal.3d 247, 280 [221 Cal.Rptr. 794, 710 P.2d 861]; *People v. Robertson* (1982) 33 Cal.3d 21, 53, 60 [188 Cal.Rptr. 77, 655 P.2d 279].) Under the circumstances of this case, however, it was not necessary. *Defendant* first told the jury of the conviction, and the prison packet was admitted by stipulation, so there was no question whether he suffered the conviction. All that CALJIC No. 8.86 would have done was to imply that the conviction was a factor in aggravation, which would, if anything, have aided the prosecution, not defendant. Any error was harmless beyond a reasonable doubt.

#### e. *Refusal to Instruct on Remorse*

The court refused the defense request to instruct the jury that "[y]ou may not consider lack of remorse as an aggravating factor. Further, you may not consider the defendant's trial testimony in which he denied legal responsibility for the crimes charged as evidence of lack of remorse." Defendant argues the instruction was necessary because there was evidence from which the jury could infer he lacked remorse.

 We disagree. The jury may consider the circumstances of the crime in aggravation. (§ 190.3, factor (a).) Accordingly, "[t]he jury may consider the defendant's refusal to show any remorse in the context of the murder as an aggravating factor." (*People v. Ochoa* (2001) 26 Cal.4th 398, 449 [110 Cal.Rptr.2d 324, 28 P.3d 78].) Although the prosecution is precluded from arguing that lack of remorse can be found in defendant's claim of innocence (*People v. Fierro* (1991) 1 Cal.4th 173, 243–244 [3 Cal.Rptr.2d 426, 821 P.2d 1302]; *People v. Coleman* (1969) 71 Cal.2d 1159, 1169 [80 Cal.Rptr. 920, 459 P.2d 248]), or that lack of remorse not related to the crime is an aggravating factor (*People v. Mendoza* (2000) 24 Cal.4th 130, 186 [99 Cal.Rptr.2d 485, 6 P.3d 150]; *People v. Proctor* (1992) 4 Cal.4th 499, 545 [15 Cal.Rptr.2d 340, 842 P.2d 1100]), the prosecution did not make these arguments. Thus, the proposed instruction was unnecessary. The standard instructions, which the court gave, were sufficient.

### 4. *Jury Deliberation Claims*

#### a. *Jurors' Questions*

Defendant argues the court prejudicially erred in answering several jurors' questions during the penalty phase. We find no error.

The first question asked, "Please review instruction regarding severity of penalty. One juror has expressed belief that life in prison is more punishing than death." Over defendant's objection that the juror was revealing misconduct in the deliberations and inviting the judge to become the 13th juror, the court replied, "Under the law . . . and regardless of your personal belief as to what is harder on somebody or what is more severe or what is the tougher penalty, under the law the death penalty is the more severe penalty. Life in prison is not as severe as the death penalty. That is the law and that is the law you have to follow. . . . You can't inject your own belief as to what you think is tougher or not."

 Defendant argues that by instructing the jury that death is the more severe penalty, the court interfered with the jury's deliberative process and thereby increased the risk of an arbitrary and capricious decision on penalty. We disagree. That death is considered to be a more severe punishment than life is explicit in California law: CALJIC No. 8.88, approved in *People v. Duncan* (1991) 53 Cal.3d 955, 977–979 [281 Cal.Rptr. 273, 810 P.2d 131], states in pertinent part, "To return a judgment of death, each of you must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole." The court did not err in so instructing the jury.

The second question asked, "Please review the law regarding speculation on whether the convicted felon may later repent if given the sentence of life

imprisonment." The juror later clarified that the concern was whether it would be appropriate for the jury to consider or speculate whether defendant might repent, or have a change of character, while serving a life sentence. Without objection, the court explained: "In terms of whether or not you can speculate on certain things, the answer is no. The instructions taken as a whole clearly indicate that you cannot base any decision in this case or resolve any issue in this case by the process of speculating. You must base your decision upon the evidence and any reasonable inference to be drawn from the evidence in the case, not just speculating which means just guesswork and so forth."

Defendant now argues the court failed to address the juror's question regarding repentance and thereby sent the message that the jurors were not to consider defendant's character or propensity for repentance in their deliberations. He argues this violated his Eighth Amendment right to have the court give guidance as to the mitigating factors to be considered, citing *McDowell v. Calderon* (9th Cir. 1999) 130 F.3d 833. Because he failed to object to the court's response, defendant has forfeited the issue for appeal. In any event, the claim has no merit. The court's response did not, as defendant contends, directly or impliedly tell the jurors they could not consider defendant's character or propensity for repentance in their deliberative process. Rather, in light of the fact that defendant presented no evidence regarding repentance, the court properly instructed them they should not speculate about facts not before them.

The third question asked, "Please explain more to me mitigating and aggravating and how it fits in with factor (k) extenuating circumstances. Does that mean what positive (mitigating) things you can argue about for [*sic*] what has happen [*sic*] to the victim [*sic*] (to not give him the death penalty.) If you can give an example." The juror later clarified he was seeking an explanation of and examples of "extenuating circumstances" in reference to section 190.3, factor (k) ("Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime"). Over defendant's objection to giving any examples of extenuating circumstances, the court explained that factor (k) was "divided into two parts, . . . the circumstances related to the crime . . . and factors peculiar to the defendant's character or background. . . . The word 'extenuate,' or 'extenuate the gravity of the crime' means make less severe, make a crime not so bad. . . . If someone, for example, was convicted of stealing some food and that person was hungry at the time that that person stole, that would not be a legal defense, but it would be something that the jury would consider. [¶] It would make the crime less severe. You should not steal, but there was some, not defense or excuse, but some reason perhaps that motivated it and made it less bad as opposed to somebody stealing food to resell it to buy heroin with. [¶] The other example that I thought of is if you punch somebody in the nose, you can't do that. But

if you punch somebody in the nose because two minutes before that person had hit your little son on the head with a rock, some big grown-up man hit your five-year old son on the head with a rock, and you punched this fellow's nose in, you would probably end up being arrested and a jury would convict you of battery, but there is something there that extenuates the gravity of your act."

Defendant now argues, as he did below, that these examples trivialized the weighing process and confused the jury by creating an unreasonable expectation of what mitigating evidence could be. He argues the examples set forth an unfair standard of comparison with the facts of the case. We disagree. The examples given were reasonable explanations of general extenuating circumstances within the context of criminal behavior, and were far enough removed from the circumstances of this crime that no reasonable juror would apply the examples as standards of evidence in mitigation. The court did not err.

### b. *Alleged Coercion of Deadlocked Jury*

The court asked the jury to return separate verdicts of either "death" or "life imprisonment without parole" on count two (the murder of Allen) and on count three (the murder of Allen's fetus). On three occasions, over three days of deliberations, the jurors informed the court they were deadlocked. The jurors reported there had been changes in the votes on count two and count three on each of the ballots taken.[8] Following each declaration of deadlock, defendant moved for a mistrial, arguing in essence that further deliberations would be futile and the court's insistence in continuing deliberations constituted coercion. He now argues the court should have declared a mistrial. We disagree.

Section 1140 provides, "Except as provided by law, the jury cannot be discharged after the cause is submitted to them until they have agreed upon their verdict and rendered it in open court, unless by consent of both parties, entered upon the minutes, or unless, at the expiration of such time as the court may deem proper, it satisfactorily appears that there is no reasonable probability that the jury can agree." The determination whether there is a reasonable probability of agreement rests within the sound discretion of the trial court. (*People v. Proctor, supra,* 4 Cal.4th at p. 539.) "Although the

---

[8] On the first day, after four hours of deliberation, one ballot was taken, revealing votes of nine to three on count two, and six to six on count three. Later that afternoon, the second, third, and fourth ballots revealed votes of eight to four, then seven to five, on count two, and nine to three on count three. On the second day of deliberations, the jury reported taking an additional five ballots, revealing consistent votes of 11 to one on count two, and fluctuating votes of eight to four, seven to five, and four to eight on count three. The jury reached a verdict on both counts on the third day.

court must take care to exercise its power without coercing the jury into abdicating its independent judgment in favor of considerations of compromise and expediency [citation], the court may direct further deliberations upon its reasonable conclusion that such direction would be perceived ' "as a means of enabling the jurors to enhance their understanding of the case rather than as mere pressure to reach a verdict on the basis of matters already discussed and considered." ' " (*People v. Proctor, supra,* 4 Cal.4th at p. 539.)

On the first occasion, the court noted that the jury had only been deliberating for four hours and had taken only one ballot. The court polled each juror individually to determine if any readback of testimony or clarification of the law would be of benefit. The court answered questions submitted by several jurors and sent the jury back to continue deliberations.

On the second occasion, later that afternoon, the court indicated that because three additional ballots had been taken and each revealed there had been changes in the votes, it was not satisfied that a unanimous verdict could not be reached. Before sending the jurors home for the weekend, the court reminded them that each had said during the jury selection process that they "were the type of folks who could choose between the penalties," that each individual juror had assured the court that he or she could vote for the punishment they thought appropriate, whether it be life without the possibility of parole or death, and that if at any time during the trial any juror felt unable to make such a decision, he or she would so inform the court. Each juror was polled and indicated he or she could make such a decision. The court instructed the jurors: "Do not take any of my comments now or at any time in this trial as suggesting how any juror should vote as to penalty on either count. . . . [¶] . . . I am not going to attempt to coerce a verdict out of a jury at all, but what I will do is explore this until I am convinced that there is no reasonable possibility of a unanimous verdict. . . . [¶] . . . Please draw no inferences from anything that I have said or any question that I may have asked about how I believe or feel this case should be resolved or if it should be."

On the third occasion, the following day, the court again noted changes in votes in the five ballots taken that day, and stated it was not satisfied a unanimous verdict could not be reached.

Defendant argues the court's comments improperly constituted subtle insistence that a verdict should be reached and implicitly required the jurors to move toward unanimity. Further, he argues the court abandoned its responsibility to remind the jurors they should not surrender their individual beliefs in order to reach a verdict. We find no abuse of discretion. In spite of the jury's assessment that it was "hopelessly deadlocked," the record reasonably supports the court's determination that the jurors had not reached an

impasse. Each successive ballot taken revealed changes in the votes. Further, contrary to defendant's argument, the court's comments did not insist that a verdict be reached. The court's comments informed the jury that deliberations would continue until the court was satisfied it was deadlocked, but they were not to infer that the court believed a verdict "should be" reached. Finally, each juror was sufficiently reminded of his or her individual responsibilities in the deliberative process when the court polled each juror to determine if each could make a choice and reach a verdict. (Cf. *People v. Rodriguez, supra*, 42 Cal.3d at pp. 774–777 [no error in denying mistrial motion when jury stated it was "hopelessly deadlocked" after 18 days of deliberations].)

### D. *Constitutionality of California's Death Penalty Law*

Defendant raises a number of facial constitutional challenges to California's death penalty statute, claims we have repeatedly rejected and find no persuasive reason to reexamine. Accordingly, we continue to hold:

▮ Section 190.2 adequately narrows the class of murder for which the death penalty may be imposed (*People v. Snow, supra*, 30 Cal.4th at p. 125), and is not overbroad, either because of the sheer number and scope of special circumstances which define a capital murder, or because the statute permits imposition of the death penalty for an unintentional felony murder (*People v. Anderson* (2001) 25 Cal.4th 543, 601 [106 Cal.Rptr.2d 575, 22 P.3d 347]).

Consideration of the circumstances of the crime under section 190.3, factor (a), does not result in arbitrary or capricious imposition of the death penalty. Contrary to defendant's position, "a statutory scheme would violate constitutional limits if it did not allow such individualized assessment of the crimes but instead mandated death in specified circumstances. (See generally *Lockett v. Ohio* (1978) 438 U.S. 586, 602–606 [57 L.Ed.2d 973, 98 S.Ct. 2954].)" (*People v. Brown* (2004) 33 Cal.4th 382, 401 [15 Cal.Rptr.3d 624, 93 P.3d 244].) The use of restrictive adjectives—i.e., "extreme" and "substantial"—in the list of mitigating factors in section 190.3 does not act unconstitutionally as a barrier to the consideration of mitigation. (*People v. Brown, supra*, 33 Cal.4th at p. 402; *People v. Prieto* (2003) 30 Cal.4th 226, 276 [133 Cal.Rptr.2d 18, 66 P.3d 1123].)

▮ California death penalty law is not unconstitutional for failing to impose a burden of proof—whether beyond a reasonable doubt or by a preponderance of the evidence—as to the existence of aggravating circumstances, the greater weight of aggravating circumstances over mitigating circumstances, and the appropriateness of a death sentence. (*People v. Brown, supra*, 33 Cal.4th at p. 401; *People v. Lenart* (2004) 32 Cal.4th 1107, 1136 [12 Cal.Rptr.3d 592, 88 P.3d 498]; *People v. Hillhouse* (2002) 27 Cal.4th 469,

510–511 [117 Cal.Rptr.2d 45, 40 P.3d 754].) The jury is not constitutionally required to achieve unanimity as to aggravating factors. (*People v. Brown, supra,* 33 Cal.4th at p. 402; *People v. Prieto, supra,* 30 Cal.4th at p. 275.) Recent United States Supreme Court decisions in *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348] and *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428] have not altered these conclusions. (*People v. Brown, supra,* 33 Cal.4th at p. 402; *People v. Prieto, supra,* 30 Cal.4th at p. 275.)

Because neither capital defendants nor noncapital defendants have their penalties fixed under the standard of proof beyond a reasonable doubt, the death penalty does not in that respect violate principles of equal protection. (*People v. Marshall* (1990) 50 Cal.3d 907, 936 [269 Cal.Rptr. 269, 790 P.2d 676].) The trial court is not required to identify which factors are aggravating and which are mitigating, or to instruct that the jury must restrict its consideration of evidence in this regard. (*People v. Brown, supra,* 33 Cal.4th at p. 402.) The jury is not required to make written findings. (*Ibid.*; *People v. Frierson* (1979) 25 Cal.3d 142, 178–180 [158 Cal.Rptr. 281, 599 P.2d 587].)

■ The failure to require intercase proportionality review does not render the law unconstitutional. (*People v. Brown, supra,* 33 Cal.4th at p. 402; *People v. Prieto, supra,* 30 Cal.4th at p. 276.) ■ The jury need not unanimously consider unadjudicated criminal activities as factors in aggravation, but such criminal activities can be considered only if deemed true beyond a reasonable doubt. Unanimity is required only as to the appropriate penalty. (*People v. Anderson, supra,* 25 Cal.4th at p. 590.) ■ Prosecutorial discretion whether or not to seek the death penalty does not render the law vague or arbitrary. (*People v. Brown, supra,* 33 Cal.4th at p. 403; *People v. Crittenden, supra,* 9 Cal.4th at p. 152.)

■ Finally, California's death penalty statute does not "fall short of international norms of humanity and decency." "International law does not prohibit a sentence of death rendered in accordance with state and federal constitutional and statutory requirements." (*People v. Hillhouse, supra,* 27 Cal.4th at p. 511; see also *People v. Brown, supra,* 33 Cal.4th at p. 404.)

### E. *Cumulative Error*

Defendant contends that the cumulative effect of errors in the guilt and penalty phases requires reversal. "Defendant has demonstrated few errors, and we have found each error or possible error to be harmless when considered separately. Considering them together, we likewise conclude that their cumulative effect does not warrant reversal of the judgment." (*People v. Bolden* (2002) 29 Cal.4th 515, 567–568 [127 Cal.Rptr.2d 802, 58 P.3d 931].)

## III. CONCLUSION

We affirm the judgment.

George, C. J., Baxter, J., Werdegar, J., and Moreno, J., concurred.

**KENNARD, J.**, Concurring and Dissenting.—With respect to the *guilt phase* of defendant's capital trial, I join the majority in upholding the convictions for the attempted murder of Bernard Canto (Pen. Code, §§ 187, 664),[1] the murders of Alicia Allen (Canto's fiancée) and her 17-week-old fetus (§ 187), and other crimes not pertinent here, as well as the jury's findings that defendant committed the murders under the special circumstances of felony-murder robbery, felony-murder burglary (§ 190.2, subd. (a)(17)(A), (G)), and multiple murder (§ 190.2, subd. (a)(2)). I write separately to clarify the problem with the trial judge's questioning of defendant in front of the jury during defendant's testimony on his own behalf at the guilt phase. The majority says that it does "not endorse all of the trial court's questioning," and acknowledges that "some of it [was] inappropriate," but it provides no guidance as to which questions were improper or why. (Maj. opn, *ante*, p. 350) As I will explain, certain of the court's questions may well have conveyed to the jury the judge's opinion that defendant's testimony was not credible. In doing so, the judge became an advocate for the prosecution, abandoning the neutrality required of a judge. The error, however, was harmless.

With respect to the *penalty phase* of trial, I conclude that the trial court committed prejudicial error when it excluded certain evidence proffered by defendant. I therefore disagree with the majority's holding that the court properly excluded this evidence, and I dissent from the majority's affirmance of the judgment of death.

### I

During the evening of August 9, 1994, Bernard Canto was found on a sidewalk near the apartment complex where defendant lived. He had been shot three times, but he survived. Later that night, neighbors saw two men come to the house where Canto lived with his fiancée, Alicia Allen. One of the men went inside. The neighbors later heard shots and saw the two men fleeing; one of them was limping. When police officers came to the house, they found the body of Allen, who had been shot twice in the head. The house had been ransacked. When defendant was arrested, he had a gunshot wound in his leg, and he had a large quantity of cocaine.

---

[1] Unless otherwise indicated, all section references are to the Penal Code.

Before defendant's capital trial, Canto was murdered in Chicago. At the guilt phase of the trial, the prosecution had Canto's preliminary hearing testimony read to the jury. In that testimony, which the jury evidently believed, Canto said that defendant asked for a ride to his apartment, promising to repay $1,500 that he owed Canto. When they arrived, however, defendant suddenly shot Canto three times and left him lying outside the apartment complex. Canto also said that after Allen's killing some money was missing from the home he shared with Allen and that he had told defendant, before Allen's murder, that he kept a large amount of money there.

The prosecution also presented the testimony of Regina Mills, with whom defendant stayed after Allen's murder. She testified that defendant told her that he was injured in a shootout that occurred in a robbery, and that he had shot a woman who he thought was pregnant.

Testifying in his own defense, defendant denied shooting either Canto or Allen. He said that Canto was a drug dealer; that he himself was a "middle man" who put together buyers and sellers of cocaine and marijuana; and that on the morning of the shootings Canto had telephoned him that he had buyers who wanted a kilogram of cocaine. Defendant said that he told Canto he would buy the cocaine and bring it to Canto, but that he actually delivered a kilogram of fake cocaine to Canto, who gave defendant $16,000 and said he wanted four more ounces of cocaine as soon as possible.

Defendant further testified that when he returned to the Canto/Allen house with the last cocaine order, armed strangers tied his hands. He said he managed to break free, but then two men grabbed him, one of them shot him in the leg, and he heard the other man exclaim that the shot hit him too. According to defendant, the gunman then tried to shoot defendant in the face, but the gun jammed and defendant ran away. He insisted that he never saw Allen that night and that he did not know she had been killed until he read about it in the newspaper.

The defense argued that the two men who defendant said had attacked him at the Canto/Allen home must have killed Allen, and that they were the same two men whom neighbors saw fleeing from the home shortly after shots were fired. According to the defense, the limping man who fled from the home was not defendant (as the prosecution had claimed), but the man who (according to defendant's testimony) was hit by the bullet that wounded defendant in the leg.

## II

After defendant's testimony at the guilt phase of trial, the prosecutor cross-examined him. The trial court then asked defendant a series of questions. Defendant contends that some of these questions could have conveyed to the jury that the trial court was on the side of the prosecutor. I agree.

" 'The law of this state confers upon the trial judge the power, discretion and affirmative duty . . . [to] participate in the examination of witnesses whenever he believes that he may fairly aid in eliciting the truth, in preventing misunderstanding, in clarifying the testimony or covering omissions, in allowing a witness his right of explanation, and in eliciting facts material to a just determination of the cause.' " (*People v. Carlucci* (1979) 23 Cal.3d 249, 256 [152 Cal.Rptr. 439, 590 P.2d 15], quoting Gitelson, *A Trial Judge's Credo* (1966) 7 Santa Clara L.Rev. 7, 13–14.)

In asking such questions, however, "the trial court must not undertake the role of either prosecutor or defense counsel." (*People v. Carlucci, supra,* 23 Cal.3d at p. 258.) "The examination should relate to material matters and be conducted impartially, so that the jury will not receive improper inferences as to the judge's opinions on the case." (3 Witkin, Cal. Evidence (4th ed. 2000) § 82, p. 116; see also *People v. Camacho* (1993) 19 Cal.App.4th 1737, 1744 [24 Cal.Rptr.2d 286].) "The trial judge's interrogation 'must be . . . temperate, nonargumentative, and scrupulously fair.' " (*People v. Hawkins* (1995) 10 Cal.4th 920, 948 [42 Cal.Rptr.2d 636, 897 P.2d 574].) The judge "may not ask questions to convey to the jury his opinion of the credibility of a witness" (*People v. Rigney* (1961) 55 Cal.2d 236, 241 [10 Cal.Rptr. 625, 359 P.2d 23]) and "must not become an advocate for either party" (*ibid.*).

Here, the trial court's examination of defendant began with these questions:

"Court: When you were in [Canto and Allen's] house, you say you heard a gun go off? Who did you figure was being shot?

"Defendant: I thought I was being shot at.

"Court: At some point did it dawn on you that perhaps somebody else had been shot in the house?

"Defendant: No.

"Court: *Never did?*

"Defendant: No." (Italics added.)

The trial judge's question—"Never did?"—did nothing to clarify the evidence. Defendant had already answered that it had not occurred to him that anyone in the house had been shot, and the judge's question merely compelled defendant to repeat his answer. Viewed in isolation, this initial part of the judge's questioning would be a trivial matter. But this was simply the first instance of a recurring theme throughout the trial judge's questioning of defendant, in the course of which defendant had to repeat answers he had already given, answers that seemed damaging to the defense.

The trial court's examination continued:

"Court: Did you think that Mr. Canto might be in there?

"Defendant: Yes, I figured it was a possibility he was in there.

" Court: You didn't see him, though?

"Defendant: No.

"Court: Did you think the young lady [Canto's girlfriend, Allen] might be in there?

"Defendant: No, because I haven't seen her. I didn't see her earlier when I was there.

"Court: You didn't think she was home?

"Defendant: No, I didn't.

"Court: Did you ever call the house later on to see if anybody got killed?

"Defendant: No, I didn't.

"Court: Why not?

"Defendant: Just never crossed my mind.

"Court: *Didn't?*

"Defendant: No.

"Court: *Weren't you curious?*

"Defendant: I was more distraught." (Italics added.)

The trial judge's first question that I have italicized—"Didn't?"—once again compelled defendant to repeat testimony apparently damaging to the defense. The judge then immediately asked a largely rhetorical question—"Weren't you curious?"—that may have conveyed to the jury that the judge did not believe defendant's testimony.

The court went on:

"Court: In the next couple of days did you ever call [Canto and Allen's] house or try to contact Mr. Canto?

"Defendant: Like I said, I believe it was the next day that I read the newspaper.

"Court: You said two days later.

"Defendant: I believe it was either that day or the next day.

"Court: It wouldn't be in the next morning's paper since it happened so late.

"Defendant: I couldn't say for sure. I couldn't say what day it was.

"Court: *You never called to find out what happened?*

"Defendant: No.

"Court: *Never did?*

"Defendant: No.

"Court: *You were ignorant of it until you read it in the paper?*

"Defendant: Yes." (Italics added.)

The trial court's question, "You never called to find out what happened?" was argumentative. The judge had already asked that question, and defendant had answered it. Replying to this repetitive question, defendant again said he had not called Canto at his home to find out what had happened. The court then rhetorically asked, "Never did?" This was the *third time* the court had asked defendant whether he had called, in addition to the questions about why he had not done so. The judge's concluding question—"You were

ignorant of [the shooting of Allen] until you read it in the paper?"—simply repeated an answer defendant had earlier given.

The judge's repetitive questions to defendant did not " 'aid in eliciting the truth, in preventing misunderstanding, in clarifying the testimony or covering omissions, in allowing a witness his right of explanation, and in eliciting facts material to a just determination of the cause.' " (*People v. Carlucci, supra,* 23 Cal.3d at p. 256.) Rather, they served only to highlight for the jury implausible aspects of defendant's testimony, thus improperly conveying to the jury the judge's view that defendant's testimony was not credible. (See *People v. Rigney, supra,* 55 Cal.2d at p. 241.)

Nevertheless, reversal is not required. Defendant did not object to the trial court's questions. (See *People v. Corrigan* (1957) 48 Cal.2d 551, 556 [310 P.2d 953] ["It is settled that a judge's examination of a witness may not be assigned as error on appeal where no objection was made when the questioning occurred"].) Moreover, the evidence of guilt was strong, and defendant's claim of innocence was unpersuasive. Although the trial court should not have asked questions revealing its disbelief of defendant's story, the weaknesses in that story would have been apparent to the jury, particularly after the prosecutor pointed them out in his closing argument. Thus, it is not "reasonably probable" (*People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]) that the jury would have reached a different result at the guilt phase of defendant's trial if the trial court had not asked the improper questions I discussed earlier. Nor were the court's questions so damaging or unfair as to violate defendant's right to a fair trial under the Fourteenth Amendment to the federal Constitution.

## III

Before trial, the prosecution moved to exclude all evidence tending to show that Canto, the victim of the attempted murder, was dealing drugs that were kept in the home he shared with murder victim Allen, his fiancée, and that Allen knew this. Below, I briefly describe the most significant defense evidence that the prosecution sought to exclude:

(1) Deborah Chambers, who was Canto's former wife and the mother of his three children, had lived with Canto for 10 years. She was expected to testify for the defense that Canto never held a "regular job," yet had "a lot of money," that he traveled extensively, and that she ended her relationship with him approximately one year before the murders in this case because "she believed his drug dealing activities placed her and her children in danger." Chambers also would testify that she warned Canto's fiancée Allen, that Canto was a drug dealer, and that if Allen remained with Canto she would run the risk of getting killed.

(2) Canto's neighbors saw extensive foot traffic at Canto's house at all hours of the day and night.

(3) After the murders, police found three bulletproof vests at Canto's home, one of which had a bullet hole in it.

(4) Two defense witnesses were prepared to testify that Canto always carried a gun.

(5) After the preliminary hearing but before trial in this case, Canto was murdered in Chicago by one Melvin Walford. In his confession, Walford said that he, Canto, and another man had been trafficking in cocaine for several years; that on the day Canto was killed the three of them were in Canto's car when Canto accused Walford of stealing from him; that after angry words were exchanged, Canto ordered Walford out of the car; and that Walford, angry at being ordered out of the car, pulled out his gun and shot Canto several times, killing him.

All of this proffered testimony—except for the neighbors' testimony about the foot traffic at the Canto/Allen home—was excluded both at the guilt phase and at the penalty phase. Although the majority acknowledges that some of this defense evidence should have been admitted at the guilt phase to support defendant's claim of innocence, it concludes that the evidence was irrelevant at the penalty phase. I disagree with the latter conclusion.

Based on the evidence proffered by defendant, considered along with defendant's guilt phase testimony that he and Canto were drug dealers, the jury could have concluded: (1) Canto was a dealer who dealt drugs out of his and Allen's home; (2) although there was no evidence that Allen herself was dealing drugs, she knew Canto kept drugs for sale in their home, and they jointly possessed them (see, e.g., *People v. Saldana* (1984) 157 Cal.App.3d 443, 455 [204 Cal.Rptr. 465] ["the prosecution was able to prove that [the defendant] had . . . possession of the heroin since it was found in the bedroom over which he exercised joint dominion and control"]; *People v. Crews* (1952) 110 Cal.App.2d 218, 220 [242 P.2d 64] [evidence of narcotics and paraphernalia found in "open sight" in their home "was sufficient to support the finding of joint possession of husband and wife"]; see generally *People v. Newman* (1971) 5 Cal.3d 48, 52 [95 Cal.Rptr. 12, 484 P.2d 1356]; *People v. Harrington* (1970) 2 Cal.3d 991, 998 [88 Cal.Rptr. 161, 471 P.2d 961]); (3) defendant knew that Canto and Allen kept drugs and the profits from drug sales in their home; and (4) defendant killed Allen and tried to kill Canto to obtain the drugs and money.

The excluded defense evidence about Canto's activities as a drug dealer and about Allen's knowledge of the drug dealing and her joint possession of

the drugs was admissible on two grounds. It was admissible under factor (a) of section 190.3, which allows the prosecution and the defense to introduce evidence pertaining to "[t]he circumstances of the crime of which the defendant was convicted in the present proceeding," and it was admissible to rebut the victim impact evidence that the prosecution presented.

As used in factor (a) of section 190.3, the phrase "the circumstances of the crime" is broadly defined. It "does not mean merely the immediate temporal and spatial circumstances of the crime. Rather it extends to '[t]hat which surrounds materially, morally, or logically' the crime." (*People v. Edwards* (1991) 54 Cal.3d 787, 833 [1 Cal.Rptr.2d 696, 819 P.2d 436]; see also *People v. Smith* (2005) 35 Cal.4th 334, 352 [25 Cal.Rptr.3d 554, 107 P.3d 229].) Here, Canto's activities as a drug dealer, and Allen's knowing acquiescence in those activities, were circumstances that surrounded both morally and logically the murders of Allen and the fetus she was carrying, in particular because the presence of the drugs and the cash proceeds from drug sales provided the motive for the robbery murders.

The evidence was also admissible to rebut the prosecution's victim impact evidence. In *Payne v. Tennessee* (1991) 501 U.S. 808 [115 L.Ed.2d 720, 111 S.Ct. 2597], the United States Supreme Court held that in capital prosecutions the Eighth Amendment's prohibition of cruel and unusual punishment does not bar presentation of evidence "about the victim and about the impact of the murder on the victim's family," and that a state may properly conclude that such evidence "is relevant to the jury's decision as to whether or not the death penalty should be imposed." (501 U.S. at p. 827.) The court explained that "[v]ictim impact evidence is simply another form or method of informing the sentencing authority about the specific harm caused by the crime in question, evidence of a general type long considered by sentencing authorities." (*Id.* at p. 825.) The court acknowledged a concern "that the admission of victim impact evidence permits a jury to find that defendants whose victims were assets to their community are more deserving of punishment than those whose victims are perceived to be less worthy" (*id.* at p. 823), but the court thought this concern unfounded: "As a general matter, however, victim impact evidence is not offered to encourage comparative judgments of this kind—for instance, that the killer of a hardworking, devoted parent deserves the death penalty, but that the murderer of a reprobate does not. It is designed to show instead *each* victim's 'uniqueness as an individual human being,' whatever the jury might think the loss to the community resulting from his death might be." (*Ibid.*)

Here, the prosecution's case in aggravation at the penalty phase relied heavily on victim impact testimony showing the effect of Allen's death on her mother and grandmother. As part of this testimony, the jury learned that in

high school Allen had been a cheerleader who was on the debate team and loved to dance. Defendant should have been permitted to add to this portrait by presenting evidence that Allen's fiancé, Canto, was a drug dealer who kept drugs and drug money at their apartment, and that Allen was aware of and acquiesced in this drug dealing and, by reasonable inference, benefited financially from it.

Does the erroneous exclusion of this evidence require reversal of the death judgment? Under state law, error at the penalty phase of a capital trial requires reversal of a death judgment if there is a reasonable possibility that the error affected the penalty verdict. (*People v. Jackson* (1996) 13 Cal.4th 1164, 1232 [56 Cal.Rptr.2d 49, 920 P.2d 1254].) This standard "is the same, in substance and effect, as the *harmless beyond a reasonable doubt* standard of *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824]." (*People v. Jones* (2003) 29 Cal.4th 1229, 1264, fn. 11 [131 Cal.Rptr.2d 468, 64 P.3d 762].) In adopting this strict standard, the court has recognized the inherent difficulty of making prejudice determinations for penalty phase errors: "A capital penalty jury . . . is charged with a responsibility different in kind from . . . guilt phase decisions: its role is not merely to find facts, but also—and most important—to render an individualized, *normative* determination about the penalty appropriate for the particular defendant—i.e., whether he should live or die." (*People v. Brown* (1988) 46 Cal.3d 432, 448 [250 Cal.Rptr. 604, 758 P.2d 1135].) "As the representative of the 'community at large, the jury applies "its own moral standards to the aggravating and mitigating evidence" ' to determine if death or life [imprisonment without parole] ' "is the appropriate penalty for [that] particular offense and offender." ' " (*People v. Mendoza* (2000) 24 Cal.4th 130, 192 [99 Cal.Rptr.2d 485, 6 P.3d 150].)

Here, the evidence erroneously excluded by the trial court is unlike the mitigating evidence customarily offered by the defense at the penalty phase of a capital case in that it pertained primarily to the behavior of the victims, not the defendant. Some jurors might well reject such evidence as irrelevant or unpersuasive, or even be offended by a perceived attempt to attack the character of the victims. Other jurors, however, may have viewed the evidence that attempted murder victim Canto was a drug dealer and that murder victim Allen allowed Canto to sell illegal drugs from the apartment they shared and benefited financially from the illegal drug sales as significantly weakening the aggravating force of the prosecution's victim impact evidence and as making the murders of Allen and her fetus marginally less heinous. I cannot say *beyond a reasonable doubt* that the jury here would not have viewed the evidence in this way, nor can I say *beyond a reasonable doubt* that consideration of this evidence would not have affected the penalty verdict, causing at least some jurors to select the penalty of imprisonment for life without possibility of parole. Apart from the circumstances of the crimes

and the victim impact evidence, the only circumstance in aggravation suggested by the prosecution was defendant's one prior felony conviction, for drug possession. Because the case in aggravation was not overwhelming, I conclude that the error in excluding the evidence was prejudicial and that the judgment should be reversed as to penalty.

Appellant's petition for a rehearing was denied October 19, 2005. Kennard, J., did not participate therein.