Filed 2/13/14  P. v. Reynoso CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E056855 |
| v. | (Super.Ct.No. FWV902966) |
| DANIEL ANGEL REYNOSO, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Stephan G. Saleson, Judge.  Affirmed.

Esther K. Hong, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, James D. Dutton and Donald W. Ostertag, Deputy Attorneys General, for Plaintiff and Respondent.

1

A jury found defendant and appellant Daniel Angel Reynoso guilty of assault by means likely to produce great bodily injury (Pen. Code, § 245, subd. (a), count 1) and found true the allegation that he personally inflicted great bodily injury within the meaning of Penal Code section 12022.7, subdivision (a). The court sentenced defendant to a total of six years in state prison, but suspended imposition of sentence and placed him on probation for three years, under specified conditions.

On appeal, defendant contends that the trial court erred in denying his request to introduce evidence of the victim's conversation with a police detective. We disagree and affirm.

FACTUAL BACKGROUND

*Prosecution Evidence*

Ernie Kueng (the victim) owned a shop, and defendant was his "neighbor" in the commercial building where his business was located. The shop was the victim's workplace and residence. Defendant and the victim were initially friendly with each other, but then the relationship went "sour." On August 18, 2009, the victim took a bike ride. Upon returning to his shop, Michael Karalis, defendant's friend, confronted the victim. Karalis accused the victim of breaking his windshield. The victim did not know what Karalis was talking about, and they got into an altercation. Defendant came out of his shop and walked over toward Karalis. The victim got back on his bike and started to ride to the other side of the building. He turned around and saw defendant and Karalis talking. Then he saw Karalis walking up the sidewalk toward him. Karalis kicked the

2

victim's dog along the way. Karalis went to the front of the victim's shop and ripped a sensor from the top of the doorway. The victim became upset, walked over to Karalis, asked him what he was doing, and shoved him with his hand. At that point, the victim saw defendant come at him with a clenched fist and his arm cocked back. Defendant punched the victim with his fist in the face. As a result of the punch, the victim spun around and fell to the ground. As he fell, he felt his leg bend the wrong way and break. Once the victim was on the ground, defendant punched him in the face repeatedly. Karalis kicked the victim in the face. The victim was unable to defend himself and lost consciousness. When he regained consciousness, defendant and Karalis were gone.

Michael Foster, who worked in one of the shops in the same building, saw the attack occur. He saw a man punch someone else four or five times and then step back. A second man stepped up to the same spot, and Foster saw him make a stomping motion. Foster then saw the two men walk away from the scene. Foster walked over and saw the victim on his hands and knees in the doorway, bloody. He called 911. The victim was transported to the hospital, where he stayed for 11 days. He suffered a broken ankle, a dislocated jaw, and broken bones in his face.

The police officers who responded to the scene talked with a witness who told them there were two subjects near the rear of the building who had blood all over their clothing. The officers approached the suspects and identified them as defendant and Karalis. Defendant had fresh injuries to his knuckles. Both defendant and Karalis admitted that they were involved in the fight. They also said that defendant was the one

3

who hit the victim. Defendant told Officer Santiago Mota that he hit the victim because the victim had broken his friend's windshield. The police placed them under arrest. On the way to the police station, defendant never mentioned to the police that he was injured, or that a knife was involved. The only injuries that Officer Mota noticed were the injuries to defendant's hands.

Stacy Burris, a forensic specialist, took photographs at the scene. She took photographs of the front entrance to the victim's shop, and she noticed a knife inside the office. She asked Officer Mota if the knife was related to the incident, and he said, "no." Officer Mota said it was a "hand-to-hand altercation" and that she did not need to collect the knife; however, since it was there, he asked her to take a picture of it.

At the police station, Officer Mota read defendant his *Miranda*[1] rights and then asked him questions about the incident. Defendant told him that Karalis was in a shoving match with the victim. Defendant admitted that he "lost it" when he saw his friend being pushed into a bush, so he went to assist his friend. Defendant said he punched the victim "until [he] saw blood coming out of his mouth and then [he] stopped." Defendant said he should not have stopped because he was so mad at the victim, but "something told [him] to stop." Officer Mota asked if defendant used any weapons, and defendant pointed to his knuckles and said, "These are my weapons." Defendant did not mention that there were any other weapons involved in the fight. Defendant's shirt was taken for evidence by the forensics officer. Officer Mota saw defendant's torso and did not observe any

---

[1] *Miranda v. Arizona* (1966) 384 U.S. 436.

4

injuries. Defendant was issued an orange jumpsuit, which was made out of a light paper material. After defendant put it on, Officer Mota did not see any blood seeping through the jumpsuit.

At trial, the victim was shown a picture of the front door of his shop. There was a knife in the picture, and the victim testified that the knife belonged to him. The victim specifically testified that he did not use the knife to attack defendant. He said that it was just an all-purpose knife that was usually kept on his oak unit inside, or in one of the drawers. On cross-examination, defense counsel showed the victim two more pictures of the knife that was found in the doorway on the day of the incident. The victim again identified the knife as his. The victim said that he turned the knife over to Detective Patrick Sandford in December 2010. Defense counsel then showed the victim a picture of the entryway to his shop. The victim confirmed that the entryway was covered with blood and his knife was on the floor.

*Defense Evidence*

Defendant testified on his own behalf. On the day of the incident, defendant said he had plans to meet Karalis. Karalis went to the building where defendant's and the victim's shops were located. Defendant saw Karalis and the victim engaged in a debate. Defendant went to go find someone else, but then heard a "roaring sound." He started running to see where the sound was coming from and, as he rounded the corner of the building, he saw Karalis falling. By the time he reached Karalis, Karalis was standing with his back toward defendant. The victim saw defendant coming; the victim raised

5

both his hands, and cursed at him. Defendant observed an instrument in the victim's hand, but was not able to identify it. He believed it was some kind of weapon. Defendant ran into the victim and pushed him up against the corner of the building. The victim swung his right arm toward defendant's head, but defendant blocked him. Defendant hit the victim in the face, and the victim moved back half a step. The victim stepped forward and swung his right arm toward defendant again. Defendant hit the victim. The victim fell backward, and defendant fell on top of him. Defendant then hit the victim four more times. The victim's arms were flailing, and he was not able to fight back. When defendant saw the victim spit blood out of his mouth, defendant stopped, got up, and walked away. Defendant said neither he nor Karalis kicked the victim. Defendant called 911. On cross-examination at trial, defendant was asked why he did not tell the 911 operator he was attacked by someone with a weapon. Defendant said it was "not the foremost thing on [his] mind," and that he was just concerned with getting help for the victim and getting the police there.

After the police arrested him and took him to the station, defendant was asked to give up his clothes, and he was given an orange jumpsuit. About 12-14 minutes after he removed his shirt, he discovered a wound on his chest that was bleeding. Defendant was asked several times if he needed medical attention, and he said no.

On cross-examination, defendant confirmed that he did not see the victim or Karalis hit each other or see anyone injured in their argument, yet he sprinted all the way

6

to the victim and slammed him into the corner of the building. Defendant also claimed that the victim attacked him with a weapon, and that he beat the victim up in self-defense.

ANALYSIS

The Trial Court Properly Excluded the Audio Recordings of Conversations Between the Victim and a Police Detective

Defendant contends that the court erred in excluding evidence of telephone conversations between the victim and Detective Sandford in December 2010 regarding the victim's knife. Defendant claims that he was thereby denied the rights to present a complete defense and have a fair trial. We disagree.

A. *Relevant Background*

During the prosecution's case-in-chief, the prosecutor informed the court, outside the presence of the jury, that earlier that morning, defense counsel had provided him with transcripts of two telephone conversations between the victim and Detective Sandford. During the conversations, Detective Sandford inquired as to the ownership and possession of a knife found at the crime scene. Defense counsel explained that the victim told Detective Sandford that an attorney had shown him photographs of a knife, and he said he did not know whether the knife was his or not. After Detective Sandford questioned him further, the victim said the knife looked like one of his knives, but he could not tell for sure. The victim also said that he had a conversation with someone named Miss Lewis about the knife, after she cleaned up the site. She indicated that the knife was bloody, and she cleaned it up and left it at his shop.

7

The court stated that the conversations could possibly be admissible as impeachment evidence, depending on what the victim testified at trial. The court stated that it would rule on the issue at that time.

Subsequently, during cross-examination of the victim, defense counsel focused on the knife that was found at the scene. The victim confirmed that a knife was found on the ground, and that the knife was his.

Outside the presence of the jury, defense counsel requested to play the audio recording of the victim's conversation with Detective Sandford in December 2010, wherein he allegedly claimed that the knife was not his. The court refused to allow that, noting that the victim had already identified the knife as his numerous times. The court stated that it was irrelevant whether the victim previously told Detective Sandford it was or was not his knife, since the victim already admitted at trial that it was his knife. The court thus denied the request. Defense counsel continued to argue that the victim made inconsistent statements, since he initially said to Detective Sandford that he did not know if it was his knife. The court stated that the evidence was irrelevant and that Evidence Code section 352 applied. Defense counsel maintained that the evidence was "indicative of something that goes to veracity." The court reiterated that the evidence was irrelevant, that it was "extremely outside impeachment on an extremely collateral matter," and that it would unduly consume time.

Defense counsel subsequently raised the issue again, arguing that the telephone conversations should come in to impeach the victim. However, the court denied the request again.

B. *The Evidence Was Not Relevant and Had No Probative Value*

Defendant first contends that the evidence of the victim's conversations with Detective Sandford was relevant to whether the victim was truthful about whether or not he used a knife to attack defendant, and it was also relevant to the victim's general credibility. We conclude that the evidence was not relevant.

Only relevant evidence is admissible. (Evid. Code, § 350.)[2] "'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) In determining the credibility of a witness, the jury "may consider any matter that has a tendency in reason to prove or disprove the truthfulness of his testimony at the hearing." (*People v. Harris* (2005) 37 Cal.4th 310, 337.) "The trial court has broad discretion in determining the relevance of evidence. [Citation.] We review for abuse of discretion a trial court's rulings on the admissibility of evidence. [Citation.]" (*Ibid*.)

Here, defendant argues that the evidence of the conversations between the victim and Detective Sandford was relevant "as they showed [the victim's] initial evasiveness

_____

[2] All further statutory references will be to the Evidence Code, unless otherwise noted.

9

regarding the ownership of the knife." He specifically contends that the victim's evasive responses showed that the victim "had difficulty with his 'capacity to perceive, to recollect, or to communicate' his ownership of the knife in December 2010; that his 'character for honesty or veracity or their opposites' was lacking, and that there was 'a bias, interest, or other motive' for [the victim] to eventually cooperate with the police and admit his knife ownership after Detective Sandford kept questioning him on the matter." (§ 780.) We agree with the trial court that the evidence was not relevant. It did not have any tendency to prove or disprove any disputed material fact. (§ 210.) As defendant concedes, it was undisputed that the victim owned the knife. Thus, any evidence showing that the victim was initially evasive about the ownership of the knife was not relevant at trial.

Furthermore, any evidence of the victim's evasiveness in a conversation that took place with Detective Sandford nine months before the trial was not relevant to his credibility at trial. At trial, the victim readily admitted several times that the knife belonged to him. Thus, any evidence that the victim was merely evasive with Detective Sandford would not have proven anything with regard to his truthfulness at trial.

In a related argument, defendant contends that the court erred in excluding the evidence of the victim's conversations with Detective Sandford under section 352. He asserts that the evidence had "significant probative value as to [the victim's] credibility, and whether he lied about his knife use against [defendant]." We disagree.

10

Section 352 provides that, "[t]he court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." The court properly concluded that the evidence had little probative value. The court explained that since the victim testified at trial that the knife belonged to him, there was "nothing to impeach" with evidence that he previously may have been evasive or unsure in identifying the knife. Moreover, contrary to defendant's claim, evidence of the victim's earlier conversations with Detective Sandford concerning *ownership* of the knife was not probative of whether he lied about using the knife on defendant.

Finally, defendant argues that the exclusion of the evidence of the victim's conversations with Detective Sandford was prejudicial. Although defendant claims he was denied the rights to present a complete defense and have a fair trial, we note that, "[a]s a general matter, the '[a]pplication of the ordinary rules of evidence . . . does not impermissibly infringe on a defendant's right to present a defense.' [Citations.]" (*People v. Fudge* (1994) 7 Cal.4th 1075, 1102-1103.) "Because the trial court merely rejected some evidence concerning a defense, and did not preclude defendant from presenting a defense, any error is one of state law and is properly reviewed under *People v. Watson* [(1956) 46 Cal.2d 818, 836]. [Citation.]" (*People v. McNeal* (2009) 46 Cal.4th 1183, 1203.) Having examined all the evidence, we conclude it is not reasonably probable defendant would have achieved a more favorable result absent the exclusion of the

11

evidence of the victim's conversations with Detective Sandford. Defendant himself told Officer Mota that he hit the victim because the victim had broken his friend's windshield. Defendant also admitted to Officer Mota that he "lost it" and attacked the victim because he saw Karalis being pushed into a bush. Defendant stated that he punched the victim "until [he] saw blood coming out of his mouth and then [he] stopped." When Officer Mota asked defendant if he used any weapons, defendant pointed to his knuckles and said, "These are my weapons." He did not mention that there were any other weapons involved in the fight, or that he punched the victim in self-defense. Moreover, although defendant testified at trial that the victim attacked him and was holding an instrument that he took to be a weapon, the victim testified to the contrary. The victim identified the knife found at the scene to be his, but specifically stated that he did not use the knife to attack defendant. The jury apparently believed the victim, rather than defendant. Thus, even if evidence of the conversations between the victim and Detective Sandford discussing the ownership of the knife had been admitted into evidence, it is not reasonably probable that the outcome of the trial would have been any different.

DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

HOLLENHORST
Acting P. J.

We concur:

KING
J.

MILLER
J.

13